673 A.2d 905

**In re Daniel Joseph FIORI, an adjudged incompetent.**

**Appeal of COMMONWEALTH of Pennsylvania, Attorney General.**

Supreme Court of Pennsylvania, Eastern District.

Argued April 25, 1995.

Decided April 2, 1996.

594

Sue Ann Unger, Philadelphia, for Commonwealth of Pennsylvania, Attorney General.

Robert B. Hoffman, Reed Smith Shaw & McClay, for Rosemarie Sherman.

James J. Wankmiller, Philadelphia, for Geriatric & Medical Services.

Before NIX, C.J., and FLAHERTY, ZAPPALA, CAPPY, CASTILLE and MONTEMURO, JJ.

## OPINION OF THE COURT

CAPPY, Justice:

This is an appeal by allowance from the opinion and order of the Superior Court affirming the judgment entered by the Court of Common Pleas of Bucks County, Orphans Court Division. We granted allowance of appeal to decide whether a close relative, with the consent of two physicians but without court involvement, may remove life sustaining treatment from an adult relative who is in a persistent vegetative state where that adult has left no advance directives. For the following reasons, we affirm.

As with all cases where this issue is presented, the facts here are tragic. Daniel Joseph Fiori, the nominal subject of this appeal, suffered severe head injuries in 1972 when he was approximately twenty years old. He regained consciousness after this injury, but his cognitive abilities were severely limited. In 1976, Fiori suffered a second head injury while being treated at a Veterans Administration hospital ("VA"). Fiori never regained consciousness after this second injury, and he was diagnosed as being in a persistent vegetative state ("PVS"). The term "vegetative state" describes:

a body which is functioning entirely in terms of its internal controls. It maintains temperature. It maintains heart beat and pulmonary ventilation. It maintains digestive activity. It maintains reflex activity of muscles and nerves for low level conditioned responses. But there is no behavioral evidence of either self-awareness or awareness of the surroundings in a learned manner.

*Cruzan v. Director, Missouri Dept. of Health,* 497 U.S. 261, 267, n. 1, 110 S.Ct. 2841, 2846, n. 1, 111 L.Ed.2d 224 (1990)

(citing *In re Jobes*, 108 N.J. 394, 403, 529 A.2d 434, 438 (1987)).[1] This state has been described as a "twilight zone of suspended animation where death commences while life, in some form, continues." *Rasmussen by Mitchell v. Fleming*, 154 Ariz. 207, 211, 741 P.2d 674, 678 (1987).

In this condition, all Fiori's cognitive brain functions were inoperative. He felt no pain or pleasure, and he was unable to communicate with others. Since Fiori had no capacity for voluntary muscular movements, his life functions were maintained by the provision of medications, fluids, and nutrition through a gastrostomy tube, a tube which is surgically inserted in the stomach.[2] There was no hope of Fiori ever recovering.

After Fiori's second accident, his mother, Rosemarie Sherman, was appointed guardian of his person by court order

1. A recent article published in *The New England Journal of Medicine* introduced a distinction between *persistent* and *permanent* vegetative states. The article stated that "[a] wakeful unconscious state that lasts longer than a few weeks is referred to as a *persistent* vegetative state.... A *permanent* vegetative state, on the other hand, means an *irreversible* state...." Multi–Society Task Force on PVS, *Medical Aspects of the Persistent Vegetative State* (Pts. 1 & 2), 330 New Eng.J.Med. 1499, 1501 (1994) (emphasis supplied). Based on review of prior PVS cases, the article concluded that where a persistent vegetative state was brought on by traumatic injury, the state can be judged permanent twelve months after the occurrence of the injury; the article noted that recovery after twelve months is exceedingly rare. *Id.* at 1575. For a discussion of one such emergence from a permanent vegetative state, *see* Nancy L. Childs, M.D. & Walt N. Mercer, *Brief Report; Late Improvement in Consciousness After Post–Traumatic Vegetative State*, 334 New Eng.J.Med. 24 (1996).

 The diagnosis of Fiori's condition predated this article, and thus the diagnosis of "permanent vegetative state" was not available to the attending physicians. We realize that Fiori, who had been in a vegetative state for approximately nineteen years prior to his death, would probably now be diagnosed as having been in a *permanent* vegetative state; be that as it may, we find that it would be highly improper for a court to "re-diagnose" Fiori. Thus, we will continue to refer to Fiori's condition as having been a *persistent* vegetative state.

2. Artificial hydration and nutrition are viewed as treatment by the medical community and by courts of other jurisdictions. *See, e.g., In re Conroy*, 98 N.J. 321, 372–373, 486 A.2d 1209, 1236 (1985); *In re Grant*, 109 Wash.2d 545, 559–562, 747 P.2d 445, 452–454 (1987).

entered in 1980. In February of 1992, Sherman requested that the Mayo Nursing Center, which was the nursing home caring for Fiori, remove his gastrostomy tube. The nursing home refused to comply with her request without a court order;[3] Sherman thus filed a petition in the Court of Common Pleas for Bucks County requesting an order directing the nursing home to terminate treatment. The Attorney General appeared in the proceedings and, pursuant to his request, an independent medical expert was appointed.

The opinions of two neurologists, one retained by Sherman and the other the court appointed independent expert, were entered into evidence. Both agreed that within a reasonable degree of medical certainty, Fiori's condition would not improve and he would remain in a PVS as he had done for the last seventeen years. They also stated that existing medical technology could continue to support Fiori's life functions so that his life span could extend for another ten to twenty years.

Sherman testified that her son had never spoken to her about his wishes should he ever lapse into a PVS. Nevertheless, based on her son's "love of life," Sherman was of the opinion that her son would wish the gastrostomy tube to be removed.

The trial court granted Sherman's motion, and the Attorney General appealed.

The Superior Court, sitting *en banc*, affirmed. The court determined that the decision to remove life sustaining treatment from an adult in a PVS who did not leave directions as to the maintenance of life support may be made by a close family member and two qualified physicians without court approval.

■ The Attorney General filed a petition for allowance of appeal on January 23, 1995. Prior to the granting of allow-

---

3. The nursing home did not oppose the discontinuation of life support for Fiori. It expressed no opinion as to the ultimate determination, but rather merely indicated a desire to obtain court approval of any action. *See* Mayo Nursing Center Letter, February 18, 1992. R. at 9a.

ance of appeal, Fiori died of pneumonia.[4]

In this appeal, we must determine the procedures and guidelines for removal of life sustaining treatment from a PVS patient where the patient, prior to his incompetency, failed to express his desires on such treatment. Specifically, we must determine who may make the decision for the PVS patient, what standard the decision-maker should employ, and whether the court must approve that decision.

The starting point for our analysis is an examination of the right we are to protect—the right to self-determination in regard to the acceptance or rejection of life sustaining medical treatment. Although some courts have noted constitutional bases for such a right[5], we choose to follow the example set by the courts which have relied solely on the common-law basis for the right to self-determination, and have eschewed an analysis based upon constitutional principles. *See, e.g., In re Estate of Longeway,* 133 Ill.2d 33, 44–45, 139 Ill.Dec. 780, 785, 549 N.E.2d 292, 297 (1989); *Mack v. Mack,* 329 Md. 188, 618 A.2d 744 (1992). We chose to follow this example as it allows us to adhere to the sound tenet of jurisprudence that courts should avoid constitutional issues when the issue at hand may be decided upon other grounds.. *Rescue Army v. Municipal Court,* 331 U.S. 549, 568–569, 67 S.Ct. 1409, 1419–1420, 91 L.Ed. 1666 (1947).[6]

The right to refuse medical treatment has deep roots in our common law. More than a century ago, the United States Supreme Court recognized that "[n]o right is held more

---

4. With the death of Fiori, this appeal is technically moot. Nonetheless, because this case raises an issue of important public interest, an issue which is capable of repetition yet is apt to elude review, we have decided to hear this appeal. *See Jersey Shore School Dist. v. Jersey Shore Educ. Ass'n,* 519 Pa. 398, 548 A.2d 1202 (1988).

5. *See, e.g., In re L.H.R.,* 253 Ga. 439, 321 S.E.2d 716 (1984) (basing right to self-determination on the federal right to privacy); *Corbett v. D'Allessandro,* 487 So.2d 368 (Fla.App.1986) (basing right to self-determination on state constitutional guarantees of privacy).

6. We are unable to determine from the opinion by the learned court below whether its decision is based on constitutional or common law principles, or both. We here emphasize that we resolve this issue solely on common law grounds.

sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person. . . ." *Union Pacific Railway Co. v. Botsford,* 141 U.S. 250, 251, 11 S.Ct. 1000, 1001, 35 L.Ed. 734 (1891).

From this right to be free from bodily invasion developed the doctrine of informed consent. *See Schloendorff v. Society of New York Hospital,* 211 N.Y. 125, 129–130, 105 N.E. 92, 93 (1914) (Cardozo, J.) The doctrine of informed consent declares that absent an emergency situation, medical treatment may not be imposed without the patient's informed consent. *Moure v. Raeuchle,* 529 Pa. 394, 404, 604 A.2d 1003, 1008 (1992). A logical corollary to this doctrine is the patient's right, in general, "to refuse treatment and to withdraw consent to treatment once begun." *Mack,* 329 Md. at 210, 618 A.2d at 755. Courts have unanimously concluded that this right to self-determination does not cease upon the incapacitation of the individual. *See, e.g., In re Colyer,* 99 Wash.2d 114, 660 P.2d 738 (1983); *Mack, supra; In re Quinlan,* 70 N.J. 10, 355 A.2d 647 (1976).

This right, however, is not absolute. The right of the patient to abstain from medical treatment must be balanced against interests of the state. The four state interests most commonly recognized by the courts are: 1) protection of third parties; 2) prevention of suicide; 3) protection of the ethical integrity of the medical community; and 4) preservation of life. *Superintendent of Belchertown State School v. Saikewicz,* 373 Mass. 728, 740–741, 370 N.E.2d 417, 425 (1977); *see also In re Conroy,* 98 N.J. 321, 348–349, 486 A.2d 1209, 1223 (1985).

In examining the state's interest in protecting third parties, the primary focus is on whether the patient has dependents who would be left emotionally and financially bereft were the patient to refuse medical treatment. *See, e.g., In re Farrell,* 108 N.J. 335, 529 A.2d 404 (1987); *Saikewicz, supra.* In Fiori's situation, there was no need to protect third party interests as he did not have any dependents. Thus, this state interest is not applicable here.

Furthermore, the prevention of suicide was not a consideration here. In removing life sustaining measures, the natural death process is allowed to continue; death would not have been the result of a self-inflicted injury, as is the case with suicide. *See Conroy,* 98 N.J. at 351, 486 A.2d at 1224.

Also, the ethical integrity of the medical community would not have been compromised had Sherman's request been honored. As noted by the Superior Court below, *amicus curiae,* the Pennsylvania Medical Society, had stated that the withdrawal of life-support from Fiori would not compromise medical ethical principles. *Amicus* asserted that the medical community supports the withdrawal of life sustaining treatment, including the provision of nutrition and fluid, when there is no hope of recovery and where that decision is made by a surrogate decision maker who is attempting to effectuate the wishes of the patient. Brief of the Pennsylvania Medical Society to the Superior Court at p. 16.

Lastly, we focus on the state's interest in preserving life. Of these four interests, this one is the most significant. *Rasmussen,* 154 Ariz. at 216, 741 P.2d at 683. It encompasses the separate, but related, concerns of preserving the life of the particular individual and also safeguarding the sanctity of all life. *Conroy,* 98 N.J. at 348, 486 A.2d at 1223. The state's interest in preserving life is certainly applicable in situations such as Fiori's. Yet, this interest does not outweigh the PVS patient's interest in self-determination. The state's interest in maintaining the PVS individual in an endless twilight state between life and death is so weak that it cannot overcome the individual's right to self-determination. *Rasmussen,* 154 Ariz. at 217, 741 P.2d at 683; *see also Colyer,* 99 Wash.2d at 122, 660 P.2d at 743. We thus hold that the state's interest in preserving life does not outweigh the right of the PVS patient to refuse medical treatment.

Having determined that a PVS patient's right to self-determination outweighs any interests the state may have in maintaining life sustaining treatment for the patient, we must examine how that right may be exercised. Where a PVS

patient created advance written directives prior to incapacitation, we have statutory provisions which provide for the implementation of the patient's wishes. *See* Advance Directive for Health Care Act, 20 Pa.C.S. § 5401 *et seq.* ("Act"). Yet, the Act does not address the situation where no advance directives were left as to treatment.[7]

■ Where a statute does not exist on the subject, there are various legal theories on which authorization to terminate life support may be predicated. The approach taken by many of our sister states[8], and by the Superior Court below, is to allow a close family member to exercise "substituted judgment" on behalf of the patient. In exercising "substituted judgment," the surrogate decision maker:

> considers the patient's personal value system for guidance. The surrogate considers the patient's prior statements about and reactions to medical issues, all the facets of the patient's personality that the surrogate is familiar with—with, of course, particular reference to his or her relevant philosophical, theological, and ethical values—in order to extrapolate what course of medical treatment the patient would choose.

*Jobes,* 108 N.J. at 414–415, 529 A.2d at 444 (footnote omitted). The substituted judgment approach "is intended to ensure that the surrogate decision maker effectuates as much as possible the decision that the incompetent patient would make if he or she were competent." *Id.* at 414, 529 A.2d at 444. Even where the individual has not expressed thoughts concerning life-sustaining treatment, the patient's preferences can

---

**7.** The failure of the Act to address situations such as Fiori's does not preclude these PVS patients from exercising their right to refuse medical treatment. The legislature was meticulous in stating that the Act does not "impair or supersede any existing rights or responsibilities not addressed in this chapter." 20 Pa.C.S. § 5412. Furthermore, the Act specifically declared that "[t]he absence of a declaration by a patient shall not give rise to any presumption as to the intent of the patient to consent to or to refuse the initiation, continuation, or termination of life-sustaining treatment." 20 Pa.C.S. § 5407(b). Thus, the position that since the Act does not explicitly condone Fiori's right to refuse medical treatment, then it must forbid it, is patently erroneous.

**8.** *See, e.g., Jobes, supra; Mack, supra.*

still be ascertained by referring to all of the aspects of his or her personality. *See Estate of Longeway,* 133 Ill.2d at 49–50, 139 Ill.Dec. at 787–788, 549 N.E.2d at 299–300.

The minority of states requires that there be "clear and convincing" evidence of the patient's intent to withdraw life support.[9] This is the most stringent approach. This standard requires "[n]othing less than unequivocal proof" of the patient's express wishes as to the decision to terminate life support is at issue. *In re Westchester County Medical Center (O'Connor),* 72 N.Y.2d 517, 534 N.Y.S.2d 886, 891, 531 N.E.2d 607, 612 (1988). *See also Cruzan v. Harmon,* 760 S.W.2d 408 (Mo.1988), *aff'd., Cruzan v. Director, MO. Health Dept.,* 497 U.S. 261, 110 S.Ct. 2841, 111 L.Ed.2d 224 (1990) (court found that PVS patient's expressions to a roommate that she would not want to be maintained on life support if she were ever to become a "vegetable," and other similar observations, did not meet the clear and convincing evidence standard because the statements did not deal specifically with the withdrawal of artificial hydration and nutrition; the PVS patient was thus maintained on life-support.)

The Attorney General argues that the clear and convincing evidence standard should be used. To support this argument, he notes that the guardianship statutes employ the clear and convincing evidence standard for the resolution of certain issues;[10] thus, since this standard is applicable to some determinations via the guardianship statute, then it perforce applies to this decision. We disagree. The guardianship statutes simply do not address a situation such as we have before us,

---

9. We note that the term "clear and convincing evidence" in this context refers to the requirement that the individual in question must have stated in an explicit fashion the exact treatment desired were the patient to lapse into various medical conditions. The term "clear and convincing evidence" is used more commonly, however, as a burden of proof. In that context, the standard refers to that quantum of evidence necessary for a party to establish a point. For further illumination on the distinction *see generally* Comment, *The Right to Die,* 96 Dick.L.Rev. 649, 651 and 665–669.

10. For example, clear and convincing evidence is required for determinations of incapacity and appointment of a guardian. 20 Pa.C.S. §§ 5511(a) and (f).

and thus we do not find that the clear and convincing evidence standard is mandated here.

Furthermore, we find the clear and convincing evidence test to be overly restrictive, one which would thwart the PVS patient's right to determine the medical care to be received. Were this test to be applied, all of those patients who did not have the prescience or the sophistication to express clearly and unmistakably their wishes on this precise matter would not be able to have life support removed. For those individuals, the choice concerning medical treatment would not be an extrapolation based upon their individual beliefs. Rather, the "choice" would be dependent simply upon how far the frontiers of medical science had advanced: if the life sustaining procedures were available, they would be automatically administered. This we cannot tolerate.

Thus, we agree with the Superior Court below that the substituted judgment standard is the proper approach. We believe that where a PVS patient has not left instructions as to the maintenance of life sustaining treatment, the only practical way to prevent the destruction of the PVS patient's right to refuse medical treatment is to allow a substitute decision maker to determine what measures the PVS patient would have desired in light of the patient's prognosis. *Accord Jobes,* 108 N.J. at 414, 529 A.2d at 444.[11]

11. We also note that in addition to the substituted judgment and clear and convincing evidence standards, some courts have also adopted a standard known as the "best interests" analysis. *See, e.g., Rasmussen,* 154 Ariz. at 222, 741 P.2d at 689. This analysis allows a decision maker to determine if withdrawal of life support would be in the best interests of the PVS patient. The analysis is an objective one, one which considers the patient's relief from suffering, the preservation or restoration of functioning, and the quality and extent of sustained life. The President's Commission for the Study of Ethical Problems in Medicine and Biomedical and Behavioral Research, *Deciding to Forego Life–Sustaining Treatment,* at 135 (1983) ("President's Commission Report").

As discussed herein, we decide today that a close family member of a once competent adult who is now in a permanent vegetative state may effectuate substituted judgment on the patient's behalf. We determine that where there is enough data for the decision maker to ascertain what the patient would have desired, the decision maker *must* effectuate substituted judgment. Where the patient's desires can be discerned

We also hold that a close family member is well-suited to the role of substitute decision maker. *Accord see, e.g., Colyer,* 99 Wash.2d at 127, 660 P.2d at 745–746; *Foody v. Manchester Memorial Hospital,* 40 Conn.Supp. 127, 482 A.2d 713 (1984); *Jobes,* 108 N.J. at 415–417, 529 A.2d at 445. Close family members are usually the most knowledgeable about the patient's preferences, goals, and values; they have an understanding of the nuances of our personality that set us apart as individuals. President's Commission at 128. *See also Jobes,* 108 N.J. at 416, 529 A.2d at 445. In addition to the greater knowledge of the PVS patient's personal views, close family members have a special bond with the PVS patient. "Our experience informs us that family members are generally most concerned with the welfare of a patient." *Jobes,* 108 N.J. at 416, 529 A.2d at 445.

 Furthermore, concomitant with the substitute decision maker's exercise of the PVS patient's right to refuse treatment, the surrogate must also obtain written statements of two doctors qualified to evaluate the patient's condition. These statements must certify that the patient has been diagnosed as being in a permanent vegetative state.[12] If the patient has an attending physician, that physician shall also prepare a statement. *See also Jobes, supra.*

In the case at bar, the two neurologists whose opinions on Fiori were presented at the trial court concurred that Fiori's

via substituted judgment, it would be improper to employ instead the objective best interests standard to make that decision. Thus, in cases such as Fiori's, where a relative of a once competent adult, now in a permanent vegetative state, can effectuate a substituted judgment, a best interests analysis may not be employed.

We recognize, however, that there will be situations where there is simply no basis to effectuate a substituted judgment. An example of this situation is where the patient is an infant, and thus never developed a personal ethical code or views on life. We are not here confronted with such a circumstance, and are loathe to determine now whether we will adopt the best interests standard for those types of situations. Thus, we leave for another day the issue of whether this jurisdiction will adopt the best interests standard where there is no basis to make a substituted judgment.

12. For the distinction between *permanent* and *persistent* vegetative state, see n. 1, *supra.*

PVS was irreversible. Drawing on her knowledge of her son when he was competent, Sherman testified that based on her son's love of life and his personal ethics, her son would no longer wish to be kept alive in his present condition. The Superior Court held that the medical evidence and Sherman's testimony were sufficient to support her decision to terminate life sustaining measures for her son; we find no fault with the lower court's determination.

The final question for our review is what role the judiciary will play when situations such as Fiori's arise. We believe that where the physicians and the close family member are in agreement, and there is no dispute between "interested parties," [13] there is no need for court involvement. *Accord Colyer,* 99 Wash.2d at 127, 660 P.2d at 746; *Jobes,* 108 N.J. at 423, 529 A.2d at 449; *Rasmussen,* 154 Ariz. at 224, 741 P.2d at 691. The court's involvement in "substantive decisions concerning medical treatment should be limited to resolving disputes ... Where ... all affected parties concur in the proposed plan of medical treatment, court approval of the proposed plan of medical treatment is neither necessary nor required." *Rasmussen,* 154 Ariz. at 224, 741 P.2d at 691.

The Attorney General argues that approval of the decision to terminate life-support is a uniquely judicial function, and that we would be abandoning our role as a court. We disagree. As Judge Beck stated in her opinion below, the judiciary has no role to play:

where there is a loving family, willing and able to assess what the patient would have decided as to his or her treatment, all necessary medical confirmations are in hand, and no one rightfully interested in the patient's treatment disputes the family decision. (Citations omitted.) Those who disagree with this view and who favor court intervention in every case often cite the need for the court to protect the patient. Underlying this rationale is the philosophy

13. "Interested parties" may include, but is not limited to, close family members, the guardian of the incompetent, attending physicians, or the care facility in which the patient is located. *See Rasmussen,* 154 Ariz. at 223, 741 P.2d at 691.

that only courts can provide the necessary safeguards to assure protection of life. This is a narrow and unhealthy view. It violates the essential and traditional respect for family. It is yet another expansion of the idea that courts in our society are the repository of wisdom and the only institution available to protect human life and dignity.

*Fiori*, 438 Pa.Super. at 627, 652 A.2d at 1358.[14]

At the close of this opinion, we stress that the matter *sub judice* addresses only a very narrow issue: whether life-support may be terminated for a PVS patient who was once competent, but did not express desires as to medical treatment, and who may make that choice. It would be unwise for us to speak to alternate scenarios that are not now before us. Thus, we explicitly note that our holding today applies only to situations where the individual in question was once a competent adult, but is now in a permanent vegetative state, and while competent that individual left no advance directives pertaining to life sustaining measures. We think it wise that "in deciding a question of such magnitude and importance . . . it is the [better] part of wisdom not to attempt, by any general statement, to cover every possible phase of the subject." *Cruzan*, 497 U.S. at 277–278, 110 S.Ct. at 2850–2851 (citations omitted).

For the reasons stated herein, we affirm the decision of the Superior Court.

MONTEMURO, J., who was sitting by designation, did not participate in this decision.

ZAPPALA, J., files a concurring opinion.

ZAPPALA, Justice, concurring.

I join in the majority opinion except insofar as it imposes a requirement that the consent of two physicians be obtained

---

**14.** The Attorney General also raised the issue that a guardian *ad litem* need be appointed in cases such as Fiori's, and that the trial court erred in failing to appoint one. As we hold that no legal proceedings are necessary in cases such as Fiori's, then clearly there would be no need for the appointment of a guardian *ad litem*.

before a close relative may elect to remove life sustaining treatment from an adult. It is difficult to conceive of a situation in which a relative of an adult who is in a persistent vegetative state would not consider the attending physician's medical diagnosis or, if needed, consult with another physician before making such a weighty decision. Where the family member exercises his or her judgment and concludes that the advice or expertise of another physician is unnecessary, it is unduly burdensome to require two qualified physicians, in addition to the attending physician, to evaluate the patient's condition.

The majority requires written statements of two physicians and of the attending physician certifying that the patient is in a persistent vegetative state. There is no statement of policy reasons or explanation given for the necessity of obtaining statements from three physicians. If the purpose is to ascertain whether the patient is in fact in a persistent vegetative state, that may be accomplished by the written statement of a single qualified physician. The written statements of additional physicians do nothing more than assuage a doubting conscience. They do not assure the infallibility of the diagnosis. If the family member needs such reassurance, he or she will seek it. I see no reason for the law to require it.

I would hold that the written statement of a single physician is sufficient to establish the patient's condition where there is no dispute among the interested parties. We have defined "interested parties" to include close family members, a guardian of an incompetent, attending physicians, and the care facility in which the patient is located. I trust that those parties will voice their concerns or disagreement if dissatisfied with the diagnosis. In the absence of any compelling reason to require written statements of two additional physicians, I must depart from that portion of the majority's decision.