J-A17010-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT OP 65.37**

| | | |
|---|---|---|
| IN RE: ESTATE OF F.K., AN ALLEGED INCAPACITATED PERSON | : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: M.K. | : : : : : : | |
| | : | No. 1415 EDA 2023 |

Appeal from the Decree Entered May 15, 2023
In the Court of Common Pleas of Bucks County Orphans' Court at No(s):
2023-E0229

BEFORE:  KING, J., SULLIVAN, J., and PELLEGRINI, J.*

MEMORANDUM BY PELLEGRINI, J.:                    **FILED AUGUST 22, 2023**

M.K. appeals from the decree entered in the Court of Common Pleas of Bucks County (orphans' court) granting the petition to decline life sustaining treatment filed by his sister, K.P. and granting her the authority to decline treatment for their mother, F.K., who is presently in a comatose state.  M.K. contends that the orphans' court applied an incorrect legal standard in granting the petition.  We affirm.

**I.**

**A.**

F.K. suffered a fall and brain injury on March 17, 2023, about two weeks after she underwent surgery to remove a meningioma from her spine.  F.K.

_____

* Retired Senior Judge assigned to the Superior Court.

was residing with K.P. at that time and she was rushed to the Emergency Room at St. Mary Medical Center in Langhorne, Pennsylvania, where she arrived in a comatose state. F.K. is not married and her ex-husband and oldest son are deceased.

K.P. filed an emergency petition seeking guardianship of F.K. and the authority to decline life-sustaining treatment in opposition to the wishes of M.K. The parties reached an agreement on April 4, 2023, pursuant to which K.P. was appointed limited guardianship with the authority to make all medical decisions except to withdraw life-sustaining treatment, and M.K. was granted the opportunity to obtain an additional medical opinion relative to their mother's condition. At an April 17, 2023 hearing, M.K. advised the orphans' court that he had been unable to obtain a second medical opinion and the court appointed counsel for F.K., with instructions to arrange for an independent physician to assess her condition.

**B.**

On April 25, 2023, the orphans' court heard testimony from K.P., M.K., Dr. Jeffrey Anderson and Dr. Burt Blackstone. K.P. testified that since F.K. has been hospitalized, she has not communicated at all and is unable to move, speak or open her eyes. F.K.'s physicians have advised that she will remain in this state until she completely deteriorates, and that there is no chance of recovery. Her condition has worsened in that she has edema, needed a blood transfusion and has involuntary movements showing that she is struggling to

expel excretion from her mouth and chest cavity, but is unable to cough it up. F.K. cannot continue to stay in the hospital because there is no treatment available to her and she will be transferred to a long-term care facility.

K.P. relayed that prior to the coma, she had spoken to F.K. at length regarding plans for her burial at a Catholic cemetery, including the dress that she wanted to be buried in. K.P. explained her reasoning for filing her petition as follows:

> I believe [F.K.] would not want to be in this state. She was a very independent woman, very sharp mind. She was 81 years old and she drove herself everywhere. She took care of herself. She cooked. She cleaned. She still entertained for her family, you know. She was still lugging the Thanksgiving turkey she wanted to do, not as heavy, maybe 13 pounds, and she loved living her life. She loved being outside. Out of all of the places she rented before she finally bought her final residence near me, she always wanted a balcony or a patio because she loved being outside in the nice weather. This was, like, a perfect time of year for her, not too hot, just perfect. And she loved going out to lunch with the ladies, you know, she made friends with at her, you know, near her community. She loved to visit me, my granddaughter, you know, [M.K.], her grandchildren. She, you know, she was an active grandmother, and she cared about her appearance. She would go to the grocery store with lipstick on even when we had to wear masks. I said, Mom, why do you have lipstick under that? You're dirtying your mask. Well, I always do this. And, you know, she had dignity. She cared about the way she looked. I look at her now in this hospital bed and she looks terrible. She looks terrible, and I know it's not how she would want to be existing until the very end because that is what I was told is that this is, a — it is an end-stage state for her, and eventually infection, *et cetera*, will cause her to succumb.

> \* \* \*

> Just that, you know, my mother was a very independent woman who loved life. She loved living her life. She, you know, loved to get around herself, do things for herself. In fact, when

- 3 -

she — after she had her surgery, I remember one of the first things she said was, [K.P.], you know — this was when she got back to my house, and she was, like, I didn't think I would be like this. I said, what do you mean? She said, well, look. It's like it takes me a couple of times to get up to get to my walker. She's, like, I didn't think it would be, you know, I would be weak like this. And I said, well, that's why we are getting — I'm getting you physical therapy and OT to get your strength back. . . . So, she was disappointed and frustrated with herself that she couldn't do, you know, the basic things, showering herself, all of those things. She didn't like me to shower her. . . .

(N.T. Hearing, 4/25/23, at 26-27, 31-32).

F.K.'s treating physician, Dr. Anderson, who has been employed at St. Mary Medical Center for 20 years, was certified as an expert in trauma surgical and critical care. He testified that F.K. sustained a severe brain injury, is in a deep coma, is dependent on a ventilator and is being fed through a feeding tube. He opined that "her chances of a meaningful recovery are almost zero . . . [and] she will not recover from this deep coma." (*Id.* at 44). He explained that F.K. will be released to a skilled nursing facility and will end up being transferred back and forth "from the nursing facility into an acute care hospital with infections, urinary tract infections, pneumonia, bed sores and blood clots . . . her condition will slowly deteriorate." (*Id.* at 45). Dr. Anderson opined that there is no possibility that function will be restored to F.K.'s body and that her medical condition is incurable.

Dr. Blackstone also treated F.K. and has worked at St. Mary for 20 years, currently in the role of Trauma Program Medical Director. Dr. Blackstone opined that F.K. "will not have any meaningful recovery at all . . . [and] has

an end-stage medical condition." (*Id.* at 64-65). He indicated that although F.K. does have some brain activity and is not brain dead, her brain damage is severe and he does not believe she will ever recover functional ability. F.K. has shown no signs of moving in the direction of improvement, Dr. Blackstone has observed no form of communication from her, nor does she demonstrate any awareness of her surroundings. Dr. Blackstone opined that F.K. has an end stage terminal condition, that she is permanently unconscious, and that if he were in the difficult circumstance of having a family member in her condition, he would make the family member comfortable and withdraw treatment.

M.K. testified that prior to F.K.'s surgery, he spoke with her on the phone twice per day and he visited her once or twice a month. M.K. sees his mother at the hospital everyday and he testified that he has observed her move her feet. He stated that F.K. is in stable condition and he believes that she needs additional time to recover. He described F.K. as a devout Roman Catholic who brought her family to church often when they were children and continues to practice her faith. M.K. testified that in the course of talking to his mother about health issues in the family, she indicated that in the event she was: "knocked unconscious, that she'd want to be taken care of . . . [and said:] if I'm still alive, please keep me alive and take care of me . . . I live for my children and grandchildren." (*Id.* at 92). M.K. reiterated that his mother

would want to continue life-sustaining treatment and be placed in assisted living or in her home with care.

On May 11, 2023, the orphans' court heard additional testimony from the physician secured by counsel for F.K., Dr. John Northrop of the Philadelphia VA Medical Center, where he serves on a hospital-wide ethics committee with involvement in issues surrounding termination of life-sustaining treatment and was qualified as an expert in psychiatry and neurology. Dr. Northrop conducted an independent assessment of F.K. and opined that based on his review of her medical records and examination, that the determination made by St. Mary staff that she in in a persistent vegetative state is correct. He testified that the facility has performed all of the indicated tests, consultations and examinations on F.K. and he "concur[ed] with their conclusion that she is comatose and has a dire prognosis for any meaningful recovery." (N.T. Hearing, 5/11/23, at 22). The orphans' court took the matter under advisement at the conclusion of the hearing.

**C.**

On May 15, 2023, the orphans' court entered its decree granting the petition to decline life-sustaining treatment, stating that this ruling was in F.K.'s best interest and that it relied on the "substituted judgment" standard set by our Supreme Court in **In Re Fiori**, 673 A.2d 905 (Pa. 1996) in reaching its decision. The court denied M.K.'s motion for reconsideration after holding oral argument. M.K. timely appealed and filed a motion for stay of the decree

pending appeal. The court granted the stay and it and M.K. complied with Rule 1925. *See* Pa.R.A.P. 1925(a)-(b).

In its Rule 1925(a) opinion, the orphans' court stated that it did not find M.K.'s testimony concerning F.K. being "knocked unconscious" credible as to context or content, and, in any event, it would be more relevant to a state of temporary unconsciousness rather than a vegetative state. (*See* Orphans' Court Opinion, 6/23/23, at 15). In contrast, the court credited K.P.'s testimony as to her mother's frustration at her limitations following surgery, her burial plans, the independent spirit with which she lived her life, as K.P. recounted specific details describing her conversations with F.K. during her testimony. (*See id.*). The court gave great weight to the opinions of the three physicians that F.K. will remain in a persistent vegetative state[1] until she ultimately dies, and in this very sad case, its grant of the petition to decline life sustaining treatment was appropriate. (*See id.* at 16).

## II.

M.K. contends the orphans' court erred in granting K.P. the authority to decline life sustaining treatment for F.K. and that in doing so, it improperly

---

[1] The term vegetative state describes: "A body which is functioning entirely in terms of its internal controls. It maintains temperature. It maintains heartbeat and pulmonary ventilation. It maintains digestive activity. It maintains reflex activity of muscles and nerves for low level conditioned responses. But there is no behavioral evidence of either self-awareness or awareness of the surroundings in a learned manner." *In Re Fiori*, *supra*, at 908.

employed both a "best interests" analysis and the "substituted judgment" approach outlined as the only appropriate standard in *Fiori*, *supra*. (*See* M.K.'s Brief, at 2, 28-31). He further maintains the court failed to give appropriate weight to the evidence indicating that F.K. would choose to continue life-sustaining treatment, including the conversations he had with his mother wherein she stated that she would want to be "taken care of" in the event she was "knocked unconscious", as well as her strong religious background and beliefs, especially in light of the short amount of time she has been comatose.[2] (*See id.* at 32-41).

In *In re Fiori*, our Supreme Court determined the guidelines for removal of life-sustaining treatment from a person in a persistent vegetative

_____

[2]

> When reviewing a decree entered by the Orphans' Court, this Court must determine whether the record is free from legal error and the court's factual findings are supported by the evidence. Because the Orphans' Court sits as the fact-finder, it determines the credibility of the witnesses and, on review, we will not reverse its credibility determinations absent an abuse of that discretion. However, we are not constrained to give the same deference to any resulting legal conclusions. The Orphans' Court decision will not be reversed unless there has been an abuse of discretion or a fundamental error in applying the correct principles of law.

*In re Estate of Ruhlman*, 291 A.3d 916, 919 (Pa. Super. 2023) (citation omitted).

state (PVS), where that person, prior to incompetency, failed to express her desires on such treatment.[3]  As part of its analysis, the Court explained:

> The right to refuse medical treatment has deep roots in our common law.  More than a century ago, the United States Supreme Court recognized that "[n]o right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person. . . . "  *Union Pacific Railway Co. v. Botsford*, 141 U.S. 250 (1891).
>
> From this right to be free from bodily invasion developed the doctrine of informed consent.  The doctrine of informed consent declares that absent an emergency situation, medical treatment may not be imposed without the patient's informed consent.  A logical corollary to this doctrine is the patient's right, in general, to refuse treatment and to withdraw consent to treatment once begun.  Courts have unanimously concluded that this right to self-determination does not cease upon the incapacitation of the individual.

*In re Fiori*, *supra* at 909–910 (most citations omitted).

Here, as noted, M.K. contends the orphans' court failed to appropriately apply the "substituted judgment" approach adopted in *Fiori*, a case involving a patient diagnosed by two physicians as being in a PVS.  The Court held that under these circumstances, a close family member may effectuate what the patient would have decided regarding withdrawal of life-sustaining treatment

_____

[3] In a sub-issue, M.K. challenges the orphans' court's use of the phrase "**persistent** vegetative state" instead of what he contends is the appropriate medical standard of "**permanent** vegetative state."  (*See* M.K.'s Brief, at 41-42, 49).  M.K. claims that the court incorrectly conflated these terms and that the distinction is relevant given the short amount of time F.K. had been in a coma.  However, the *Fiori* Court expressly defined PVS as "**persistent** vegetative state" and we find no merit to this claim.  *See Fiori*, *supra* at 908.

in the absence of an advance directive. In exercising "substituted judgment," the surrogate decision maker:

> considers the patient's personal value system for guidance. The surrogate considers the patient's prior statements about and reactions to medical issues, all the facets of the patient's personality that the surrogate is familiar with, with of course, particular reference to his or her relevant philosophical, theological, and ethical values-in order to extrapolate what course of medical treatment the patient would choose. The substituted judgment approach is intended to ensure that the surrogate decision maker effectuates as much as possible the decision that the incompetent patient would make if he or she were competent. Even where the individual has not expressed thoughts concerning life-sustaining treatment, the patient's preferences can still be ascertained by referring to all of the aspects of his or her personality.

*Id.* at 911 (citations and quotation marks omitted).

The Court distinguished this "substituted judgment" standard from a "best-interests" approach, which "allows a decision maker to determine if withdrawal of life support would be in the best interests of the PVS patient. The analysis is an **objective** one, one which considers the patient's relief from suffering, the preservation or restoration of functioning, and the quality and extent of sustained life." *Id.* at 912 n.11 (emphasis added). It determined "where the patient's desires can be discerned via substituted judgment, it would be improper to employ instead the objective best interests standard to make that decision." *Id.*

Instantly, the orphans' court stated:

> [B]ased upon the opinion of three physicians who evaluated or treated her, we concluded that [F.K] is not going to recover in any meaningful way. We gave great weight to the shared expert

- 10 -

opinion that [F.K] will never recover and will remain in a persistent vegetative state until she ultimately succumbs to an infection or passes for another reason. [F.K] permanently remaining in her present vegetative state will **never enable her to do the things that she enjoyed doing before her fall: visiting her grandchildren, interacting with friends, and getting dressed up for a day out. Regrettably, [F.K] is permanently unconscious, unable to feel pain or pleasure, and unable to communicate; therefore, she cannot enjoy her most important pleasure, living for her children and grandchildren, as both of her children testified**.

We found that the testimony of both Appellant and Appellee reflected [F.K.'s] love of life, love of being with her family, and love of her independence. Appellee's testimony as to [F.K's] struggles after her surgery was insightful as to how [F.K] felt about her ability or inability to do the things that matter most to her. Furthermore, we do not perceive that [F.K.'s] Catholic faith would impact upon the decision to continue or withdraw life-sustaining treatment. Withdrawing life-sustaining treatment would allow [F.K] to pass naturally if she is unable to breathe on her own, with the hospital providing comfort care if the family so chose. Considering all the testimony before us, we found as fact finder, by clear and convincing evidence, that **under the substituted judgment standard, [F.K.] would choose to have life-sustaining treatment withdrawn in her present circumstances**. Accordingly, in this very sad case, we believe that our May 15, 2023 Decree whereby we granted Appellee's Petition to Decline Life Sustaining Treatment was appropriately entered.

(Orphans' Ct. Op., at 16) (emphasis added).

Viewing the orphans' court findings in the context of the evidence presented during the several hearings held in this matter, we disagree with M.K.'s claim that the court arrived at its conclusion using an objective "best interests" standard. Rather, the record reflects that the court employed only the "substituted judgment" standard as outlined in *Fiori* and considered all evidence submitted by the parties relevant thereto. While the court did use

the words "best interests" during the proceedings, it did so within the framework of the substituted judgment approach, giving appropriate weight to the credible testimony of K.P. that her mother was an independent person who valued dignity and would want to withdraw life-sustaining treatment, in conjunction with the testimony of three physicians who opined that F.K. is in an end stage terminal condition with no expectation for recovery of even the most basic functionality.

With regard to M.K.'s contention that the orphans' court disregarded certain evidence favorable to his position that life sustaining treatment should continue, including the conversations he had with his mother and her religious beliefs, it was for the court as fact-finder to render credibility determinations and to weigh the evidence as it saw appropriate. *See In re Estate of Ruhlman*, *supra* at 919. We discern no abuse of discretion in this regard. We also note that although M.K. had ample opportunity to present medical testimony to counter that of F.K.'s two treating physicians and the independent doctor arranged through her counsel as to her terminal condition, he did not present any medical testimony whatsoever to dispute their terminal prognosis.

Accordingly, for the foregoing reasons, we affirm the orphans' court's May 15, 2023 decree granting K.P.'s petition to decline life sustaining treatment.

Decree affirmed. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: <u>8/22/2023</u>