**In re D.L.H., an incapacitated person.**

Superior Court of Pennsylvania.

Argued Nov. 19, 2008.

Filed Feb. 10, 2009.

Reargument Denied April 16, 2009.

Christopher S. Lucas, Mechanicsburg, for parents, appellants.

Jane Adams Carlisle, for D.L.H., appellee.

Howard C. Ulan, Harrisburg, for Ebensburg Center, appellee.

BEFORE: LALLY–GREEN, GANTMAN and ALLEN, JJ.

OPINION BY ALLEN, J.:

¶ 1 In a matter of first impression, this Court, *inter alia*, is asked to determine whether, under the facts of this case, the legal guardians of a lifelong incompetent person can refuse life sustaining medical treatment on behalf of the incompetent. Additionally, this Court must decide if the incompetent's common law right to refuse medical treatment, as vicariously asserted by the guardians, was infringed based upon the circumstances at bar.

¶ 2 Appellants, the parents and plenary guardians of D.L.H., appeal from the trial court's order denying their petition to decline life preserving medical treatment on behalf of D.L.H., an incapacitated person. Appellants essentially contend that although D.L.H. was neither permanently unconscious nor terminally ill, their status as the plenary guardians of D.L.H. vested them with the legal authority to make surrogate medical decisions for D.L.H., including the power to refuse potentially life sustaining medical procedures. The trial court, relying principally on the Health Care Agents and Representatives Act (the "Act"),[1] found that Appellants failed to meet the statutory requirements necessary to become D.L.H.'s "heath care agent," and thus, could not refuse life sustaining medical treatment on his behalf. We find no error in the trial court's ultimate disposition; accordingly, we affirm the trial court's order, albeit through different reasoning.

¶ 3 The underlying facts of this case are not in dispute and can be summarized as follows. D.L.H. is a fifty year old male who has suffered from profound mental retardation since birth. In his lifetime,

---

1. 20 Pa.C.S. §§ 5451–5471 (effective January 29, 2007).

D.L.H. never executed a legal instrument expressing his desires in regard to potential life sustaining medical treatment. On July 3, 2002, the trial court appointed Appellants as the plenary guardians of D.L.H., finding that D.L.H. was "so severely mentally impaired that he [was] unable to make, communicate or even participate in any decision relating to his estate or person[.]" Order, 7/03/02.

¶ 4 On December 21, 2007, D.L.H. became ill with aspiration pneumonia[2] after he swallowed a hairpin and vomited. D.L.H. was transferred from the Ebensburg Center, where he resided for forty-five years, to Memorial Hospital in Johnstown. The physicians at Memorial Hospital determined that D.L.H.'s medical condition required that he be placed on a mechanical ventilator to assist him in breathing. Appellants, as the plenary guardians of D.L.H., attempted to decline medical treatment on behalf of D.L.H., stating that mechanical ventilation was not in his best interest. The hospital, nonetheless, proceeded to place D.L.H. on a mechanical ventilator. Over Appellants' objection, D.L.H. remained on a mechanical ventilator for approximately three weeks, at which time his aspiration pneumonia subsided to the point where he no longer required ventilation treatment.

¶ 5 On January 4, 2008, Appellants filed a "Petition to Grant the Guardians Authority to Exercise the Powers of a Health Care Agent on Behalf of the Incapacitated" in the trial court. The Department of Public Welfare ("DPW") objected to Appellants' petition on the ground that D.L.H. was neither terminally ill nor permanently unconscious and never appointed a health care agent under the Act to refuse healthcare necessary to the preservation of his life. Although D.L.H. was still hospitalized at the time of the January 11, 2008 hearing, D.L.H.'s condition improved and he was removed from the mechanical ventilator. However, because D.L.H. or similarly situated individuals may at sometime in the future sustain a life threatening medical condition, the parties requested that the trial court rule on the merits of the petition. Despite the technical mootness of the issues raised in Appellants' petition, the trial court decided to hear the matter, ostensibly on the view that the issues were capable of repetition, yet likely to evade appellate review.

¶ 6 At the hearing, Appellants did not submit any evidence that tended to demonstrate that declining mechanical ventilation was, or would be, in D.L.H.'s best interest. Following hearing, the trial court, on January 24, 2008, entered an order denying Appellants' petition. The trial court perceived the issues raised in the petition as presenting pure questions of law, and concluded that since D.L.H. was not in a permanent vegetative state ("PVS"), the right of close family members to decline medical treatment of another, as enunciated in *In re Fiori*, 543 Pa. 592, 673 A.2d 905 (1996), was inapplicable. Trial Court Opinion, 1/24/08, at 4–5. The trial court further concluded that the designation of a health care agent under the Act was the exclusive vehicle by which to refuse life sustaining medical treatment in situations where the patient was not suffering from an end-stage medical condition or in a PVS. *Id.* at 3, 6. Ultimately, the trial court

---

**2.** "Aspiration pneumonia is inflammation of the lungs and bronchial tubes due to breathing in a foreign material." MedlinePlus Medical Encyclopedia, *available at http://www.nlm.nih.gov/medlineplus/ency/article/000121.htm.* "Aspiration pneumonia is caused by inhaling foreign material (usually food, liquids, vomit, or secretions from the mouth) into the lungs. This may lead to an inflammatory reaction, a lung infection (pneumonia), or a collection of pus in the lungs (lung abscess)." *Id.*

concluded that under the Act, D.L.H. was not competent to refuse medical treatment and did not appoint a statutory health care agent. *Id.* at 7. On this basis, the trial court rejected Appellants' argument that their legal status as plenary guardians of D.L.H. encompassed the power to refuse life sustaining medical treatment on his behalf. *Id.* at 7.

¶ 7 Appellants now appeal to this Court, raising the following issues for review:

A. Whether a person who has been incapacitated since birth, nevertheless, retains the inherent right to make medical decisions, including the right to refuse potentially life sustaining procedures?

B. Whether a plenary guardian of the person has the power to make surrogate medical decisions, including the power to refuse potentially life sustaining procedures, when the incapacitated person is neither permanently unconscious nor terminally ill?

C. Whether the orphans' court has the power to authorize a plenary guardian of the person to make surrogate medical decisions, including the power to refuse potentially life sustaining procedures, when the incapacitated person is neither permanently unconscious nor terminally ill?

Brief for Appellants at 6.

¶ 8 Before addressing the merits of Appellants' issues, we first determine whether the issues are moot and incapable of appellate review. Regarding the mootness doctrine, this Court has previously stated:

> Generally, an actual claim or controversy must be present at all stages of the judicial process for the case to be actionable or reviewable. If events occur to eliminate the claim or controversy at any stage in the process, the case becomes moot. Even if a claim becomes moot, we may still reach its merits if the issues raised in the case are capable of repetition, yet likely to continually evade appellate review. Therefore, if the issues raised by an appeal are 'substantial questions' or 'questions of public importance,' and are capable of repetition, yet likely to evade appellate review, then we will reach the merits of the appeal despite its technical mootness.

*In re Duran,* 769 A.2d 497, 502 (Pa.Super.2001) (internal citations omitted).

¶ 9 Here, D.L.H.'s improving health and the medical physician's decision to remove the mechanical ventilator rendered the issues raised in this appeal technically moot. Appellants' issues on appeal, however, are capable of repetition due to D.L.H.'s uncertain future medical status and the class of persons in this Commonwealth who are incapacitated and under the care of a guardianship. It is reasonably likely that at least some of these similarly situated individuals will either develop a medical condition or be involved in an accident that requires life sustaining medical treatment and the guardian will assert the authority to make such a decision on behalf of the incapacitated person. Moreover, the issues raised in this case are capable of evading appellate review if the general rule of mootness is applied, because declining mechanical ventilation in a life-or-death situation, pursuant to a court order, will likely result in death before the appellate process can be completed. Finally, at the core of Appellants' issues lie an individual's time-honored common law right to bodily integrity and right to refuse medical treatment, which "does not cease upon the incapacitation of the individual." *In re Fiori,* 673 A.2d at 910. The Act apparently represents our legislature's attempt to delineate the circumstances in which a person

may exercise these rights. Hence, the issues in the case concern matters that are of great public importance. For these reasons, we conclude that while the issues raised by Appellants are technically moot, they are nonetheless reviewable because they present questions of public importance that are capable of repetition and evading appellate review. *See In re Fiori*, 673 A.2d at 909 n. 4 (finding issue involving the decision to remove life sustaining treatment from an adult patient in a PVS technically moot as a result of the patient's death, but reaching the merits as the matter concerned a question of public importance and was capable of repetition and evading appellate review). Accordingly, we proceed to the merits of this appeal.

¶ 10 In their brief, Appellants raise three separate issues but present a conglomeration of interrelated arguments, reasoning and legal theories. For ease of disposition, we will address Appellants' contentions as one single issue.

¶ 11 Citing *In re Fiori*, 673 A.2d at 910, Appellants begin with the premise that although D.L.H. "lacked capacity from the day of his birth, he ... retains the same fundamental right to decline medical procedures that is enjoyed by other citizens." Brief for Appellants at 12. Appellants contend that D.L.H.'s right to decline medical treatment extends to them by virtue of the trial court's July 3, 2002 order granting them the status of "plenary guardians" and 20 Pa.C.S. § 5521(a), the statute governing the powers and duties of a guardianship in this Commonwealth. *Id.* at 14–16. According to Appellants, "[t]he Act should not be read to restrict the power of the orphans' court to make an appointment of plenary guardians, nor to limit the authority of plenary guardians to assert the rights of the incapacitated." *Id.* Ultimately, Appellants propose that there is no substantive distinction between the authority of a plenary guardian under 20 Pa.C.S. § 5521(a) and the authority of a health care agent under the Act. *Id.* at 18–19. Appellants therefore deduce that their status as plenary guardians, in and of itself, vests them with sufficient authority to decline life sustaining medical treatment on D.L.H.'s behalf. *Id.* at 15–16. Alternatively, Appellants recommend that in order to preserve D.L.H.'s common law right to decline medical treatment, the trial court could have specially granted them the right to exercise the power to decline life preserving treatment under the facts of this case. *Id.* at 16–19. Upon review, we find no merit in Appellants' assignments of error.

¶ 12 In order to resolve Appellants' arguments on appeal, this Court is required to construe and interpret a variety of statutes. "Issues involving statutory interpretation present questions of law for which our standard of review is *de novo* and our scope of review is plenary." *In re Jacobs*, 936 A.2d 1156, 1163 (Pa.Super.2007). In resolving issues of statutory interpretation,

> Our task is guided by the sound and settled principles set forth in the Statutory Construction Act, including the primary maxim that the object of statutory construction is to ascertain and effectuate legislative intent. In pursuing that end, we are mindful that 'when the words of a statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit.' 1 Pa.C.S. § 1921(b). Indeed, as a general rule, the best indication of legislative intent is the plain language of a statute. In reading the plain language, 'words and phrases shall be construed according to rules of grammar and according to their common and approved usage,' while any words or phrases that have acquired a 'peculiar and appropriate meaning' must be con-

strued according to that meaning. 1 Pa.C.S. § 1903(a). However, when interpreting non-explicit statutory text, legislative intent may be gleaned from a variety of factors, including, *inter alia:* the occasion and necessity for the statute; the mischief to be remedied; the object to be attained; the consequences of a particular interpretation; and the contemporaneous legislative history. 1 Pa.C.S. § 1921(c) ...

Notwithstanding the primacy of the plain meaning doctrine as best representative of legislative intent, the rules of construction offer several important qualifying precepts. For instance, the Statutory Construction Act also states that, in ascertaining legislative intent, courts may apply, *inter alia,* the following presumptions: that the legislature does not intend a result that is absurd, impossible of execution, or unreasonable; and that the legislature intends the entire statute to be effective and certain. 1 Pa.C.S. § 1922(1), (2). Most importantly, the General Assembly has made clear that the rules of construction are not to be applied where they would result in a construction inconsistent with the manifest intent of the General Assembly. 1 Pa.C.S. § 1901.

*In the Interest of C.A.,* 961 A.2d 172, 174 (Pa.Super.2008).

¶ 13 By way of background, on November 29, 2006, our governor signed the Act into law. In 20 Pa.C.S. § 5423, our legislature stated its intent and findings in passing the Act. This provision provides, in relevant part:

**§ 5423. Legislative findings and intent**

(a) INTENT.—This chapter provides a statutory means for competent adults to control their health care through instructions written in advance or by health care agents or health care repre-sentatives and requested orders. Nothing in this chapter is intended to:

(1) affect or supersede the holdings of *In re Fiori,* 543 Pa. 592, 673 A.2d 905 (1996).

(2) condone, authorize or approve mercy killing, euthanasia or aided suicide; or

(3) permit any affirmative or deliberate act or omission to end life other than as defined in this chapter.

\* \* \* \*

(c) FINDINGS IN GENERAL.—The General Assembly finds that:

(1) Individuals have a qualified right to make decisions relating to their own health care.

(2) This right is subject to certain interests of society, such as the maintenance of ethical standards in the medical profession and the preservation and protection of human life.

\* \* \* \*

20 Pa.C.S. § 5423(a)(1)-(3), (c)(1)-(2).

■ ¶ 14 We first address Appellants' assertion that the trial court's July 3, 2002 order granting them the power of "plenary guardians," in and of itself, vested them with the inherent authority to decline life sustaining medical treatment on D.L.H.'s behalf. Appellants claim that their authority as plenary guardians, standing alone, is akin to the power of a "health care agent" under the Act. After reviewing the Act and the guardianship statute, as well as the common law governing the guardianship and agency relationships, we find that Appellants' argument is unavailing.

¶ 15 The statutory provision governing the duties and powers of a guardian is contained in 20 Pa.C.S. § 5521. In pertinent part, this proviso states:

§ 5521. Provisions concerning powers, duties and liabilities

(a) DUTY OF GUARDIAN OF THE PERSON.—**It shall be the duty of the guardian of the person to assert the rights and best interests of the incapacitated person.** Expressed wishes and preferences of the incapacitated person shall be respected to the greatest possible extent. Where appropriate, the guardian shall assure and participate in the development of a plan of supportive services to meet the person's needs which explains how services will be obtained. The guardian shall also encourage the incapacitated person to participate to the maximum extent of his abilities in all decisions which affect him, to act on his own behalf whenever he is able to do so and to develop or regain, to the maximum extent possible, his capacity to manage his personal affairs.

* * * *

(d) POWERS AND DUTIES ONLY GRANTED BY COURT.—Unless specifically included in the guardianship order after specific findings of fact or otherwise ordered after a subsequent hearing with specific findings of fact, a guardian or emergency guardian shall not have the power and duty to:

(1) Consent on behalf of the incapacitated person to an abortion, sterilization, psychosurgery, electroconvulsive therapy or removal of healthy body organ.

(2) Prohibit the marriage or consent to the divorce of the incapacitated person.

(3) Consent on behalf of the incapacitated person to the performance of any experimental biomedical or behavioral medical procedure or participation in any biomedical or behavioral experiment.

* * * *

(f) POWERS AND DUTIES NOT GRANTED TO GUARDIAN.—The court may not grant to a guardian powers controlled by other statute, including, but not limited to, the power:

(1) To admit the incapacitated person to an inpatient psychiatric facility or State center for the mentally retarded.

(2) To consent, on behalf of the incapacitated person, to the relinquishment of the person's parental rights.

20 Pa.C.S. § 5521(a), (d) and (f)(1)-(2) (emphasis added).

¶ 16 Although this Court has not yet expressly defined the contours of a "plenary" guardian's power regarding the ward's person, 20 Pa.C.S. § 5521(b) states that unless otherwise provided by statute, nothing shall be construed to limit the inherent powers and duties of a guardian concerning the ward's estate. 20 Pa.C.S. § 3332 (made applicable through 20 Pa.C.S. § 5521(b) (Duty of Guardian of the Estate)).

¶ 17 On the other hand, under 20 Pa.C.S. § 5422, a "Health care agent" is defined as "An individual designated by a principal in an advance health care directive." 20 Pa. C.S. § 5422. An "Advance health care directive" is coined by statute as a "A health care power of attorney, living will or a written combination of a health care power of attorney and living will." *Id.*

¶ 18 In contrast to a guardian's statutory power, the authority of a health care agent is defined in 20 Pa.C.S. § 5456. In relevant part, this section provides:

§ 5456. Authority of health care agent

(a) EXTENT OF AUTHORITY.—Except as expressly provided otherwise in a health care power of attorney and subject to subsection (b) and section 5460 (relating to relation of health care

agent to court-appointed guardian and other agents), a health care agent **shall have the authority to make any health care decision and to exercise any right and power regarding the principal's care, custody and health care treatment that the principal could have made and exercised.** The health care agent's authority may extend beyond the principal's death to make anatomical gifts, dispose of the remains and consent to autopsies.

\* \* \* \*

(c) Health care decisions.

\* \* \* \*

(4) After consultation with health care providers and consideration of the information obtained in accordance with paragraphs (1), (2) and (3), **the health care agent shall make health care decisions in accordance with the health care agent's understanding and interpretation of the instructions given by the principal, at a time when the principal had the capacity to understand, make and communicate health care decisions.** Instructions include an advance health care directive made by the principal and any clear written or verbal directions that cover the situation presented.

20 Pa.C.S. § 5456(a), (c)(4) (emphasis added).

¶ 19 A health care agent is also granted the specific authority espoused in 20 Pa. C.S. § 5462(c)(1). This proviso states:

**§ 5462. Duties of attending physician and health care provider**

\* \* \* \*

(c) COMPLIANCE WITH DECISIONS OF HEALTH CARE AGENT AND HEALTH CARE REPRESENTATIVE.—

(1) Health care necessary to preserve life shall be provided to an individual who has neither an end-stage medical condition nor is permanently unconscious, **except if the individual is competent and objects to such care or a health care agent objects on behalf of the principal if authorized to do so by the health care power of attorney or living will.** In every other case, subject to any limitation specified in the health care power of attorney, an attending physician or health care provider shall comply with a health care decision made by a health care agent or health care representative to the same extent as if the decision had been made by the principal.

20 Pa.C.S. § 5462(c)(1) (emphasis added).[3] Significantly, pursuant to 20 Pa.C.S.

---

**3.** 20 Pa.C.S. § 5422 defines end-stage medical condition and permanently unconscious as follows:

"Permanently unconscious." A medical condition that has been diagnosed in accordance with currently accepted medical standards and with reasonable medical certainty as total and irreversible loss of consciousness and capacity for interaction with the environment. The term includes, without limitation, an irreversible vegetative state or irreversible coma. "End-stage medical condition." An incurable and irreversible medical condition in an ad-

vanced state caused by injury, disease or physical illness that will, in the opinion of the attending physician to a reasonable degree of medical certainty, result in death, despite the introduction or continuation of medical treatment. Except as specifically set forth in an advance health care directive, the term is not intended to preclude treatment of a disease, illness or physical, mental, cognitive or intellectual condition, even if incurable and irreversible and regardless of severity, if both of the following apply:

§ 5454(e), a health care agent's decision concerning life preserving medical treatment is effective without prior court approval. 20 Pa.C.S. § 5454(e).

¶ 20 Before proceeding further in our analysis, we find it necessary to discuss the distinction recognized in the common law between the roles and powers of a guardian and those of an agent in relationship to the incapacitated and/or principal. A guardian "is simply the court's bailiff or agent in protecting [the incompetent] and his estate." *Nonnenman v. Elshimy,* 615 A.2d 799, 801 (Pa.Super.1992) (internal quotation marks and citations omitted). "Although a court-appointed 'guardian' is vested with the care and management of the person ... under legal disability, the appointee, being an officer of the court, is always under the court's control and is subject to its directions as to the person of the ward." *Id.* (internal quotation marks and citations omitted). On the other hand, an agency is "the relationship which results from (1) the manifestation of consent of one person to another that (2) the other shall act on his behalf and subject to his control, and (3) consent by the other so to act." *Smalich v. Westfall,* 440 Pa. 409, 269 A.2d 476, 480 (1970). Under Pennsylvania law, an agency relationship arises whenever a person authorizes another expressly or by implication to act as his agent. *Garbish v. Malvern Fed. Sav. & Loan Assoc.,* 358 Pa.Super. 282, 517 A.2d 547, 553 (1986). "An agent has a duty to comply with all lawful instructions received from the principal and persons designated by the principal concerning the agent's actions on behalf of the principal." Restatement (Third) Agency, § 809(2) (2006).

(1) The patient would benefit from the medical treatment, including palliative care.
(2) Such treatment would not merely prolong the process of dying.

¶ 21 Therefore, a fundamental distinction exists in the common law between an agent and a guardian. An agent is subjected to the power of the principal and has a duty to carry out the principal's expressed wishes. By contrast, a guardian, acting as an officer of the court, takes action that is theoretically in the best interest of the incapacitated person and through judicial review, is subjected to the court's control regarding the ward. Under the Act, a health care agent is created by an express directive from the principal, and the agent must always act in accordance with the principal's stated instructions. On the other hand, although a guardian is supposed to consider the incompetent's expressed wishes, those wishes need not always be honored, and a guardian has latitude to take action on behalf of an incompetent that he/she personally considers is in the incompetent's best interests. Balancing these two legal capacities, the authority granted to a health care agent in § 5456 is much more consistent with the creation of an agency relationship and the duty of the agent "to comply with all lawful instructions received from the principal[.]" Restatement (Third) Agency, § 809(2) (2006). *See* 20 Pa.C.S. § 5456(c)(4)-(5).

¶ 22 Against the backdrop of this common law distinction, a plain and natural reading of 20 Pa.C.S. § 5521(a) and the relevant portions of § 5456 leads us to conclude that a health care agent, as provided for in the Act, and not a plenary guardian, possesses the specific authority to make certain health care decisions on behalf of a principal. Considering § 5456 in light of § 5461(c), we conclude that a health care agent has the express statuto-

*Id.*

ry authority to object to life sustaining medical procedures on behalf of a principal, where a principal has neither an end-stage medical condition nor is permanently unconscious. Because under 20 Pa.C.S. §§ 5456(a) and 5461(c), the authority to make these health care decisions on behalf of a principal are specifically designated to a health care agent, Appellants' status of plenary guardians, standing alone, does not confer them with the blanket authority to exercise the power of a health care agent. *Cf. In re Estate of Dorone*, 517 Pa. 3, 534 A.2d 452, 455 (1987) ("When evidence of [medical necessity] is measured against third party speculation as to what an unconscious patient would want there can be no doubt that medical intervention is required."). Were we to hold otherwise, our decision would discount the unique grant of authority that our legislature chose to vest in a health care agent created pursuant to the dictates of the Act.[4]

¶ 23 Our reading of the Act, the guardianship statute and Appellants' status as "plenary guardians" is further compelled by practical considerations. In *In re Estate of Rosengarten*, 871 A.2d 1249, 1254 (Pa.Super.2005), this Court stated that the incompetency statute is capable of providing the guardian with a tremendous amount of authority and noted that "[t]his great power creates the opportunity for great abuse." The circumstances of this case represent an occasion where a guardian could potentially abuse its authority to an unparalleled magnitude. For instance, if Appellants—by virtue of their role as plenary guardians under 20 Pa.C.S. § 5521(a)-were vested with the unconditional power of a health care agent, then any subsequent judicial review of their decision to refuse life preserving treatment could be rendered meaningless because the incompetent may already be deceased. *See* 20 Pa.C.S. § 5454(e) ("A health care decision made by a health care agent for a principal is effective without court approval."). As such, were we to adopt Appellants' proposed statutory interpretation, Appellants, in merely asserting their title as plenary guardians, would effectively have a free license to decline life preserving medical treatment on behalf of D.L.H. based solely upon what they perceive is in his best interests.

¶ 24 In light of the foregoing statutory sections, as well as the distinctions in the common law between an agency and guardianship, we conclude that Appellants' status as plenary guardians did not vest them with the blanket authority to decline life preserving medical treatment on behalf of D.L.H., where D.L.H. had neither an end-stage illness nor was is in a PVS. We do not believe that our legislature intended this Court to interpret the guardianship statute and Appellants' grant of authority as "plenary guardians" in a manner that would vest Appellants the unprecedented power to unilaterally end life. *See In re J.A.S.*, 939 A.2d 403, 406 (Pa.Super.2007) ("[I]t is presumed that the legislature did not intend an absurd or unreasonable result. In this regard, we [ ] are permitted to examine the practical consequences of a particular interpretation.") (citation and internal quotation marks omitted). Such a

---

4. We note that the Act is inapplicable to D.L.H. because he is a life-long incompetent and cannot comply with its terms for declining life-preserving medical treatment or appointing a health care agent to make the decision on his behalf. 20 Pa.C.S. § 5423(a)(stating that the Act "provides a statutory means for competent adults to control their health care through instructions written in advance or by health care agents or health care representatives and requested orders[.]"). Nonetheless, the Act and the authority of a health care agent informs our understanding of the extent to which a guardian possesses "plenary" power.

statutory construction would lead to an unreasonable outcome in that a guardian, under the guise of claiming the incompetent's best interest, could terminate the life of the incompetent whenever he/she deems fit and without first seeking judicial approval. Therefore, Appellants' status as plenary guardians, in and of itself, does not confer them with the unfettered discretion and authority to decline life preserving medical treatment on D.L.H.'s behalf.

¶ 25 We now address Appellants' alternative argument that under the facts of this case, the trial court could have specially granted them the authority to decline life preserving medical treatment on behalf of an incompetent. For purposes of this appeal, we assume, without deciding, that in exercising its inherent authority as *parens patriae,* an orphan's court could specially grant a guardian the power to decline medical treatment for an incompetent who does not have an end-stage medical illness nor is in a PVS. *See In re Terwilliger,* 304 Pa.Super. 553, 450 A.2d 1376, 1380–81 (1982) ("[T]he Commonwealth, acting in its role as *parens patriae,* has the right and the duty to act to protect its weaker members.... This doctrine of inherent parens patriae jurisdiction over decisions involving irrevocable individual."); 20 Pa.C.S. § 5521(d) presented here exemplifies one of incompetents has been extended to consequences for the incompetent. Even if this were the case, the situation those exceptional circumstances where a guardian would first have to petition the court for such power, and then prove by clear and convincing evidence that refusing medical treatment would be in the best interest of the incompetent, before exercising that power. *See* 20 Pa.C.S. § 5521(d)(1)-(3); *cf. generally In re Edna M.F.,* 210 Wis.2d 557, 563 N.W.2d 485, 490 (1997) (concluding that if an incompetent is not in a PVS, then, as a matter of law, "it is not in the best interests of the ward to withdraw life-sustaining treatment ... unless the ward has executed an advance directive or other statement clearly indicating his or her desires."). Since Appellants did not adduce any evidence to establish that refusing mechanical ventilation would further D.L.H.'s best interest, the trial court did not err in failing to grant Appellants the authority to decline life preserving medical treatment on his behalf.

¶ 26 "[P]rior judicial approval is required before a guardian may consent to administering or withholding of proposed extraordinary medical treatment." *Terwilliger,* 450 A.2d at 1380 (quoting *In re Matter of Moe,* 385 Mass. 555, 432 N.E.2d 712, 716–717 (1982)). Under 20 Pa.C.S. § 5521(d), there exists specific, delineated circumstances where a guardian, prior to implementing a power, must first petition the court for an order expressly granting it that power. For example, a guardian must petition a court for an order granting it the authority to consent, on behalf of an incompetent, to "sterilization, psychosurgery, electroconvulsive therapy or removal of a healthy body organ." *Id.* at § 5521(d)(1). A guardian must also petition the court for the authority to consent on behalf of the incapacitated person "to the performance of or participation in any experimental biomedical or behavioral medical procedure." *Id.* at § 5521(d)(1).

¶ 27 In *Terwilliger,* this Court concluded that a guardian could seek special permission from a trial court to have an incompetent sterilized by tubal ligation. Recognizing the "extraordinary" nature of the medical procedure and its potential effect on the incompetent's fundamental rights, this Court stated:

We caution that because sterilization necessarily results in the permanent ter-

mination of the intensely personal right of procreation, the trial judge must take the greatest care to ensure that the incompetent's rights are jealously guarded.

Preliminarily, we note that in making the decision of whether to authorize sterilization, a court should consider *only* the best interest of the incompetent person, not the interests or convenience of the individual's parents, the guardian or of society.

450 A.2d at 1382 (citation omitted, emphasis in original). Because the decision to sterilize an incompetent impinges on that person's rights of privacy and to procreate, this Court required proof by clear and convincing evidence that sterilization would be in the incompetent's best interest. As we pronounced:

[I]t is to be noted that we will demand from the advocates of the proposed operation proof by clear and convincing evidence that sterilization is in the best interest of the incompetent. We believe that such a standard of proof is necessary in a case such as this one, where a fundamental right is concerned.... In Pennsylvania, we require the clear and convincing evidence standard for involuntary civil commitment. Thus, because of our overriding concern to prevent any abuse of judicial authority, we are prompted to establish no less of a standard in cases which require the determination of whether sterilization is in the best interest of an incompetent person.

*Id.* at 1382 (citations omitted).

¶ 28 Albeit in another context implicating fundamental rights, this Court has held that the clear and convincing evidence standard was applicable to the termination of parental rights. *In re A.L.D.*, 797 A.2d 326, 336 (Pa.Super.2002) ("In a proceeding to involuntarily terminate parental rights, the burden of proof is upon the party seeking termination to establish by 'clear and convincing evidence' the existence of grounds for doing so.") (citation omitted). Notably, "[t]he standard of 'clear and convincing' evidence is defined as testimony that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *Id.* (citation omitted).

¶ 29 Without question, a guardian's decision to decline life preserving medical treatment on behalf of an incompetent is manifest and the consequences grave. Even more compelling than the situation in *Terwilliger*, the authority sought by Appellants in this case involved an "extraordinary" medical decision that threatened D.L.H.'s fundamental rights to privacy and life. Hence, we conclude that before a trial court could ever grant a guardian the authority to decline life preserving medical treatment on behalf of an incompetent, the guardian must first petition the court for the authority to do so, and then prove by clear and convincing evidence that death is in the incompetent's best interest.

¶ 30 After review, we conclude that the task of proving, by clear and convincing evidence, that death is in the best interest of a life-long incompetent is an extraordinary burden to carry. Preliminarily, in determining whether death would be in the incompetent's best interest, a court, as stated in *Terwilliger*, should only consider the best interest of the incompetent—not the interest or convenience of the parents, guardians or society in general. *Terwilliger*, 450 A.2d at 1382; *see Woods v. Commonwealth*, 142 S.W.3d 24, 34 (Ky.2004) (stating that the best interest standard "is not based on the surrogate's view of quality of life [or] the value that others find in the continuation of the patient's life" but rather, "the value that the continuation of life has for the patient").

¶ 31 Additionally, in order to establish that death is in the incompetent's best interest, a guardian, at a minimum, must provide reliable medical expert testimony documenting the incompetent's severe, permanent medical condition (or severe, permanent medical condition with progressive features) and current state of physical/psychological deterioration and pain. *See Rasmussen v. Fleming*, 154 Ariz. 207, 741 P.2d 674, 689 ("Under the best interests standard, the surrogate decisionmaker assesses what medical treatment would be in the patient's best interests as determined by such objective criteria as relief from suffering, preservation or restoration of functioning, and quality and extent of sustained life."). To substantiate its position, it would be wise (although not absolutely necessary depending on the severity of the medical condition) for a guardian to adduce additional evidence of the incompetent's expressions, either through demeanor or conduct, which could reasonably be interpreted as evincing the incompetent's wants, needs, and/or feelings during the course of medical treatment. *See* Eric Miller, *Listening to the Disabled: End-of-life Medical Decision Making and the Never Competent*, 74 FORDHAM L.REV. 2889, 2902–09 (2006) ("Expressions commonly asserted by incompetent patients include pushing against restraints, non-cooperation with treatment, verbalization, and actively trying to remove nutrition/hydration tubes.").

¶ 32 In the absence of any evidence of an incompetent's expressions during or prior to treatment, the quality of the medical evidence should be of such a character that a court is definitively convinced that the benefits of prolonging life, as a result of medical treatment, is markedly outweighed by the incurable nature of the incompetent's medical condition and the consistent, recurring degree of pain. That is, based upon the medical facts, diagnosis and prognosis of the particular case, a court should be able to conclude, without hesitation, that extending life would amount to an inhumane act that runs so contrary to basic notations of fundamental decency that death furthers the best interest of the incompetent. *See In re Conroy*, 98 N.J. 321, 486 A.2d 1209, 1232 (1985) ("Under [the pure-objective test], the net burdens of the patient's life with the treatment should clearly and markedly outweigh the benefits that the patient derives from life. Further, the recurring, unavoidable and severe pain of the patient's life with the treatment should be such that the effect of administering life-sustaining treatment would be inhumane.").

¶ 33 Otherwise, in assessing the benefits of a prolonged life, a court should not place any emphasis on the fact that a life-long incompetent, prior to receiving medical treatment, suffers from a mental disability or other cognitive deficiency, because this is the incompetent's natural state of being. *See id.* at 1233 ("The mere fact that a patient's functioning is limited or his prognosis dim does not mean that he is not enjoying what remains of his life or that it is in his best interests to die."). A court may, however, consider the incompetent's cognitive abilities as a starting point to analyze whether the current medical condition or proposed medical treatment has resulted, or would result, in a reduction in those abilities.

¶ 34 For purposes of this appeal, we need not postulate the extreme circumstances in which this test could be met because it is a fact-based inquiry grounded in the severity of the incompetent's specific medical condition(s) and the incompetent's expressions, if any. Here, it suffices for our disposition to state that Appellants offered absolutely no medical proof that D.L.H.'s aspiration pneumonia was a se-

vere, permanent medical condition. While D.L.H. presumably experienced temporary discomfort due to the insertion and operation of the mechanical ventilator, there is no medical testimony to demonstrate that D.L.H. suffered from a remarkable amount of pain. Moreover, there is no evidence that D.L.H. made any expression during the course of his treatment that could reasonably be viewed as a personal objection to mechanical ventilation. In his lifetime, D.L.H., although incompetent, did not express his intent to decline life preserving medical treatment either through a written instrument or a clear oral declaration. After approximately three weeks of treatment, D.L.H. fully recovered from aspiration pneumonia and he no longer required mechanical ventilation. On this record, we conclude that the evidence was clearly inadequate to establish, through clear and convincing proof, that refusing mechanical ventilation was (or could be) in D.L.H.'s best interest. Therefore, assuming, *arguendo*, that the trial court could have specially granted Appellants the power to decline life preserving medical treatment on behalf of D.L.H., Appellants have failed to establish their entitlement to receive this authority. Appellants' arguments to the contrary lack merit.

¶ 35 In reaching our disposition, we recognize Appellants' related but separate argument that because D.L.H. was incapacitated since birth, he cannot comply with the Act, and thus, his common law right to decline medical treatment was violated. Upon review, we conclude that our decision denying Appellants the authority to decline mechanical ventilation on behalf of D.L.H., under the facts of the case, does not contravene D.L.H.'s qualified, personal right to refuse medical treatment.

■ ¶ 36 "More than a century ago, the United States Supreme Court recognized that no right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person[.]" *In re Fiori*, 673 A.2d at 909 (citation omitted). The right to refuse medical treatment is deeply-rooted in the common law of Pennsylvania and does not cease upon the incapacitation of the individual. *Id.* at 909–10. Nonetheless, like so many other rights, the personal right of self-determination is not absolute. *Id.* at 910. Rather, the right must be balanced against the interests of the state, which include, among other things, the preservation of life and the protection of the ethical integrity of the medical community. *Id.*

■ ¶ 37 Our Supreme Court has held that the state's concern in preserving life is the most significant of the state's interests and is intertwined with protecting the ethical integrity of the medical profession. *See id.* "The preservation of life is not only a laudable goal for ... the physicians and for the health care facilities to aspire to, it is a compelling one." *St. Mary's Hospital v. Ramsey*, 465 So.2d 666, 668 (Fla.App.1985). A state's interest in preserving life, however, decreases proportionality when the quality of life diminishes as a result of physical deterioration. *Polk County Sheriff v. Iowa Dist. Court*, 594 N.W.2d 421, 426 (Iowa 1999). As one court elucidated:

The interest of the State in prolonging a life must be reconciled with the interest of an individual to reject the traumatic cost of that prolongation. There is a substantial distinction in the State's insistence that human life be saved where the affliction is curable, as opposed to the State interest where, as here, the issue is not whether but when, for how long, and at what cost to the individual that life may be briefly extended.

*Id.* (citing *Superintendent of Belchertown v. Saikewicz*, 373 Mass. 728, 370 N.E.2d 417, 425–26 (1977)).

¶ 38 In this case, D.L.H. was a life-long incompetent who developed aspiration pneumonia. The parties concede that D.L.H. was not suffering from an end-stage medical illness and was not in a PVS. Instead, D.L.H.'s aspiration pneumonia was a curable medical condition that required temporary mechanical ventilation. The record fails to establish that D.L.H., during his medical treatment, experienced any significant amount of pain. In the context of this case, where an incompetent person suffers a medical condition, and recovery appears imminent and the pain is minimal, the ethical integrity of the medical community certainly mandates treatment and the state's interest in preserving life is considerable. *See In re Hughes*, 259 N.J.Super. 193, 611 A.2d 1148, 1151 (App. Div.1992) (collecting cases) ("Our Supreme Court has repeatedly addressed the right to decline medical treatment in situations where the patient is opposed to prolonging an otherwise irreversible condition. The distinguishing factor in this case is that the transfusion can preserve a healthy young woman's life, not prolong a painful and imminent death."). In light of the situation presented herein, we conclude that the state's interests in preserving life and maintaining the ethical integrity of the medical profession are substantial.

¶ 39 On balance, D.L.H.'s personal right to refuse medical treatment, as maintained through Appellants, carries little weight because Appellants failed to establish that death was (or would be) in D.L.H.'s best interest. Accordingly, we conclude that based upon the facts of this case, the state's interest outweigh D.L.H.'s common law right to refuse medical treatment.

¶ 40 Finally, we note that the Supreme Court's decision in *In re Fiori* does not alter our above conclusions. In that case, the Court considered whether a PVS patient's right to refuse medical treatment extended to the situation where the patient was once competent and did not leave any instructions regarding the maintenance of life sustaining treatment. The Court held that in this situation, "the only practical way to prevent the destruction of the PVS patient's right to refuse medical treatment is to allow a substitute decision maker [*i.e.*, a close family member] to determine what measures the PVS patient would have desired in light of the patient's prognosis." 673 A.2d at 912. For a substitute decision maker to exercise a PVS patient's right to refuse medical treatment, the Court required the written statements of two qualified doctors (and if a patient had an attending physician, a statement by him/her) certifying that the patient has been diagnosed as being in a PVS. The Court further held that where the physicians, close family members and other "interested parties" agree in the outcome, judicial approval and/or intervention is not necessary. The Court, however, cautioned that its holding was strictly limited to the facts of that case:

> [W]e stress that the matter *sub judice* addresses only a very narrow issue: whether life-support may be terminated for a PVS patient who was once competent, but did not express desires as to medical treatment, and who may make that choice. It would be unwise for us to speak to alternate scenarios that are not now before us. Thus, we explicitly note that our holding today applies only to situations where the individual in question was once a competent adult, but is now in a permanent vegetative state, and while competent that individual left no advance directives pertaining to life sustaining measures.

*Id.* at 913.

¶ 41 Here, as mentioned above, the parties concede that D.L.H. was incompetent

throughout his lifetime and was not in a PVS when he received medical treatment. Following the express directives of *In re Fiori,* we conclude that its doctrine is inapplicable to the instant case. In the absence of binding decisional law to the contrary, we refuse to extend the holding in *In re Fiori* to the situation where a life-long incompetent patient is not in a medically-certified PVS.

¶ 42 In summation, we stress the narrow factual predicate of this case and emphasize that our decision is circumscribed to these facts. Particularly, D.L.H. was a life-long incompetent adult who never expressed his desires regarding life preserving medical treatment in an advanced health care directive or an oral declaration. D.L.H. suffered from a medical condition, aspiration pneumonia, which the parties agree cannot be classified as an end-stage medical illness and did not place D.L.H. in a PVS. Appellants, as plenary guardians, petitioned the trial court for the authority to decline life preserving treatment on behalf of D.L.H. Accordingly, our holding is limited to the following: where a life-long incompetent adult has neither an end-stage medical illness nor is in a PVS, and a plenary guardian seeks to decline life preserving medical treatment on behalf of the incompetent, if the plenary guardian fails to establish that death is in the incompetent's best interests, by clear and convincing proof, then the guardian does not have the legal authority to decline life preserving medical treatment on behalf of the incompetent.

¶ 43 For the above-stated reasons, we affirm the trial court's order.

¶ 44 Order AFFIRMED.