**In re ESTATE and Person OF Russell R. BORDER, Jr., An Incapacitated Person.**

**Appeal of Sharon L. Gray, Esquire, Petitioner and Former Plenary Guardian to Mr. Border.**

Superior Court of Pennsylvania.

Argued Dec. 4, 2012.

Filed April 23, 2013.

Sharon Gray, Wyomissing, for appellant.

John E. Muir, Reading, for Reading Hospital and Medical Center, appellee.

BEFORE: BOWES, OLSON and WECHT, JJ.

OPINION BY OLSON, J.:

Appellant, Sharon L. Gray, Esquire, former plenary guardian to R. Border, Jr., an incapacitated person, appeals from the order entered March 12, 2012, by the Court of Common Pleas, Orphans' Court Division, of Berks County, Pennsylvania, removing Appellant as plenary guardian of Mr. Border's person, and appointing Mr. Border's brother as plenary guardian of his person. The orphans' court's March 12, 2012 order expressly granted Mr. Border's brother the power and authority to withhold and/or decline any life-sustaining medical treatment to Mr. Border, an action which Appellant refused to authorize while serving as Mr. Border's guardian. Within hours of entry of the orphans' court's March 12, 2012 order, Mr. Border's brother authorized the withholding of Mr. Bor-

der's life-sustaining treatment, and Mr. Border died that day. On appeal, Appellant argues that an advanced directive executed by Mr. Border prior to his incapacitation survived his incapacitation, and that the orphans' court erred in removing Appellant as Mr. Border's plenary guardian and appointing a guardian willing to authorize the termination of Mr. Border's life-support. For the foregoing reasons, we affirm.

The certified record reflects the sad factual and procedural background of this matter as follows.

On March 15, 2010, the Berks County Office of Aging (the "Department") filed a petition for appointment of a guardian on behalf of Mr. Border. The petition explained that Mr. Border was a 62-year-old resident at the Golden Living Center nursing facility. According to the petition, Mr. Border required appointment of a guardian due to chronic medical conditions and failing mental health. The petition alleged that, due to the decline in his mental health, Mr. Border was a potential victim of designing persons, and needed assistance with decision-making by an advocate that had his best interest in mind. The Department averred that appointing a guardian of Mr. Border's person and estate was the least restrictive measure to protect Mr. Border's best interest. The petition listed Mr. Border's presumptive heirs as his wife and two adult daughters. The petition also acknowledged the existence of a health care power of attorney executed by Mr. Border, and naming his eldest daughter, Renee Vongpathoum, as his agent.[1] The petition requested that

---

1. There appears to be some confusion regarding the date Mr. Border executed the health care power of attorney. According to the petition, Mr. Border's health care power of attorney was executed on January 29, 2010. Petition, 4/14/2010 at ¶ 8. As will be dis-

cussed *infra*, however, the only power of attorney contained in the certified record is dated July 25, 2007. Consistent with the allegations in the petition, the July 25, 2007 document lists Mr. Border's eldest daughter, Renee Vongpathoum, as his health care

the orphans' court appoint Ms. Vongpathoum guardian of Mr. Border's person, and attorney, Sharon L. Gray, Esquire (Appellant), guardian of his estate.

On April 14, 2010, the orphans' court held a hearing on the Department's petition. At the conclusion of that hearing, the orphans' court entered an order declaring Mr. Border incapacitated, and appointing Ms. Vongpathoum plenary guardian of his person and Appellant plenary guardian of his estate.[2] Additionally, the order expressly revoked any other existing general power of attorney, limited power of attorney, and/or health care power of attorney previously executed by Mr. Border.

Two weeks later, on April 28, 2010, the Department filed a motion for reconsideration of the orphans' court's April 14, 2010 order. According to the Department's motion, Ms. Vongpathoum had arranged to have Mr. Border removed from the nursing facility, planning to return him to his residence, where Ms. Vongpathoum intended to care for him. Within the motion, the Department alleged that Ms. Vongpathoum was physically unable to care for Mr. Border, and that he should not be removed from the nursing facility. Additionally, based upon information received from Appellant, the Department cited concerns about Mr. Border's other daughter who also resided in the home. The Department suggested that the orphans' court remove Ms. Vongpathoum as guardian of Mr. Border's person, and ap-

point Appellant as guardian of both his person and his estate.

That same day, April 28, 2010, the orphans' court filed an amended order, appointing Appellant as the guardian of Mr. Border's person in addition to her role as guardian of his estate. The April 28, 2010 order repeated the previous language wherein the orphans' court revoked "any other existing general power of attorney, limited power of attorney and/or health care power of attorney" previously executed by Mr. Border. Orphans' Court Order, 4/28/2010.

From April 28, 2010 until March 12, 2012, Appellant served as plenary guardian of Mr. Border's person and estate, making all decisions regarding Mr. Border's care and finances. In March 2012, Mr. Border was admitted to the intensive care unit at Reading Hospital and Medical Center (the "Hospital"). As a patient in the intensive care unit, doctors placed Mr. Border on a mechanical ventilator and other forms of life-sustaining treatment. During this time, Mr. Border's treating physician and other Hospital personnel contacted Appellant, explaining that Mr. Border's health condition was both terminal and futile. Hospital personnel recommended that, as guardian of his person, Appellant authorize the removal of Mr. Border's life-support. Mr. Border's family, including his wife, brother, sister, sister-in-law, and both adult daughters, all agreed with the Hospital's recommendation. Appellant, howev-

agent. Consequently, while we do not know if the reference in the petition to a 2010 power of attorney was a mistake, instead intending to reference the 2007 power of attorney, we will proceed with the understanding that all of Mr. Border's health care powers of attorney appointed Ms. Vongpathoum as his health care agent.

2. Based upon the certified record, we understand that Appellant is a local attorney, famil-

iar to the Berks County Orphans' Court, but that Appellant had no previous relationship with or knowledge of Mr. Border. Indeed, Appellant acknowledges that she did not speak with or meet Mr. Border until after the orphans' court declared him incapacitated and appointed her guardian of Mr. Border's estate. Appellant was compensated for her services as Mr. Border's guardian.

er, disagreed and asserted her authority as guardian of Mr. Border's person to prohibit the removal of his life-support.

On March 8, 2012, the Hospital was provided with a copy of a Veterans Administration Advance Directive: Durable Power of Attorney for Health Care and Living Will, dated July 25, 2007 (the "Directive"). As set forth above, within the power of attorney section of the Directive, Mr. Border appointed his daughter, Ms. Vongpathoum, as his health care agent. In the event that Ms. Vongpathoum was "unavailable" to serve as his health care agent, the Directive appointed Mr. Border's wife, Charlotte Ann Border, as his health care agent.

Additionally, within the living will portion of the Directive, Mr. Border set forth that he would want to have life-sustaining treatments under all categories of situations listed in the document. The living will also stated that Mr. Border wanted his noted preferences for life-sustaining treatments to serve as a "general guide," acknowledging that "in some situations the person making the decisions for [him] may decide something different ..., if they think that it is in [his] best interest." Directive, 7/25/2007, at Part III(C).

Relying upon the Directive and conversations between herself and Mr. Border (acknowledging, however, that those conversations took place after Mr. Border was already incapacitated), Appellant steadfastly refused to authorize the removal of Mr. Border's life-support. Hospital personnel and Mr. Border's family continued to disagree. Those in disagreement with Appellant believed that removal of life-support was what Mr. Border would have wanted and was in his best interest.

As a result of the conflict, on March 12, 2012, the Hospital filed an emergency petition, seeking the removal of Appellant as plenary guardian of Mr. Border's person

and suggesting that the orphans' court appoint Mr. Border's brother ("Brother"), as the new guardian of Mr. Border's person. The orphans' court summarized the emergency petition and the subsequent proceedings as follows.

According to the petition, [Mr. Border] was a sixty-four-year-old male in the Medical Intensive Care Unit of the Hospital. The Hospital was aware of [Appellant's appointment] as [Mr. Border's] guardian pursuant to the April 28, 2010 Order ... [Within the petition, the Hospital acknowledged the existence of the 2007 Directive executed by Mr. Border, but] noted that the April 28, 2010 guardianship Order revoked the Directive[;] [however] the Hospital's position was that this Directive clearly expressed [Mr. Border's] wishes that [Mr. Border's health care agent, Ms. Vongpathoum,] should have the final say on his medical decisions.

The petition continued by alleging that [Mr. Border] was critically ill, having been a patient at the [H]ospital since February 18, 2012, and that he had previously been a patient on multiple occasions during the previous six months. Many specialists had been involved in [Mr. Border's] care and their consensus was that [Mr. Border's] prognosis was dismal and that the medical care being provided was futile and causing him pain. It was their belief that the medical treatment being provided was contra indicated and not in the best interest of [Mr. Border]. The petition summarized [Mr. Border's] medical conditions as the following:

(a) severe peripheral vascular disease which has resulted in bi-lateral lower extremity amputations;

(b) end stage renal disease which requires hemodialysis;

(c) severe sepsis;

(d) pneumonia;

(e) severe coronary artery disease;

(f) respiratory failure, which has required the use of mechanical ventilation;

(g) severe chronic ischemic white brain matter changes as a result of multiple infarcts;

(h) dementia; and

(i) stage 2/3 decubitis ulcers on his sacrum area.

The petition also alleged that [Mr. Border] suffered from low blood pressure that, together with his dialysis, made proper pain medication impossible. Despite the concerns of numerous physicians and the overwhelming medical support for the removal of life[-]sustaining measures, [Appellant] insisted that all measures be taken to sustain [Mr. Border's] life. Not only did the Hospital's staff believe that [Appellant's] direction was inconsistent with [Mr. Border's] medical diagnosis and prognosis, but it was contrary to the wishes of [Mr. Border's] family and their belief as to what [Mr. Border] would have wanted in his circumstances. The Hospital therefore requested that the [orphans' court] substitute [Brother] as guardian for [Mr. Border] and authorize him to remove the ventilator and any other forms of life[-]support from [Mr. Border], opting instead for comfort care.

The telephonic testimony of one of [Mr. Border's] treating physicians, a pulmonary critical care physician, confirmed that [Mr. Border's] medical situation was indeed dire. [Mr. Border] was suffering from multiple organ failure as a result of severe cardiovascular disease. He was in respiratory failure, meaning that he could not be weaned from a ventilator. The vascular disease required the amputation of both of his legs above the knee. His nutritional status was so poor that his wounds had not been able to heal and he had exposed bone with ongoing infections despite weeks of very aggressive antibiotic treatment. Because of his inability to heal, he was not a candidate for any further surgery. His pneumonia was not responding to appropriate antibiotic treatment, and he was suffering from a progressively worsening encephalopathy such that he was becoming less and less responsive to the surrounding environment. He was unable to communicate or respond in any meaningful fashion, and the doctor's belief was that the prognosis was terminal. He expressed that with today's technology, it might have been possible to continue to keep [Mr. Border] alive by a number of weeks, subject to the next complication arising. The doctor also expressed his opinion that [Mr. Border] was suffering from pain and discomfort but that his conditions did not allow for proper pain management without discontinuing the life-sustaining treatment that was being administered. The doctor testified that he would, of course, follow the directions of [Appellant] in treating [Mr. Border]; however, it was clear to the [orphans' court] that he did not agree with those directions; particularly in light of the family's position that [Mr. Border] should be afforded comfort care rather than prolonging his [misery].

Before talking about [Mr. Border's] wishes[,] [Brother] testified about their relationship. He talked about their hunting together for the past thirty years at a hunting camp that they built. He talked about giving his brother money and repairing his car. He talked about their having good conversations about family and what was happening socially. He talked about visiting his brother in the V.A. Hospital and in the

Reading Hospital and visiting him two to three times per week while he resided in the nursing home for the past three years. He discussed the circumstances of his brother's living situation after his initial hospitalization, which led [Brother] to contact the Office of Aging for assistance. Apparently[,] he could not get relief because it was the office's position that because [Mr. Border] was married, [Mr. Border's] wife had to make the contact. [Mr. Border's] wife, his second, was hesitant because of fears of retaliation from [Mr. Border's] daughters. Eventually, the Office of Aging did get involved as they were the petitioners for the guardianship.

[Brother] testified about his father having had diabetes. His father had a heart bypass operation and kidney failure, as well as a right leg amputation as a result of the diabetes. He testified about how he and [Mr. Border] cared for their father. He testified how he and [Mr. Border] discussed this over the years, especially over the last two years or so as [Mr. Border] continued to get sicker. They observed together how [Mr. Border's] foot became infected just like their father's and, just like their father, resulted in a leg amputation. Thereafter, [Mr. Border] had a heart attack and was to undergo a bypass operation. After the operation, his other leg became infected. [Brother] recalled a conversation with [Mr. Border] prior to the first amputation that he would refuse dialysis, which at first he did. After [Mr. Border] went into convulsions, hospital staff had talked him into having the dialysis and that's when his foot infection really started to go bad. [Brother] testified that after [Mr. Border's] first leg amputation, [Mr. Border] talked about being in pain and wanting to die. [Brother] did not believe that it was [the] drugs talking, but

rather [Mr. Border] knew what was happening to him. After the second leg amputation, [Mr. Border's] desire to die continued to be a topic of conversation. It was what [Mr. Border] wanted.

After [Mr. Border] was inflicted with pneumonia and lost his voice, [Brother] continued communication efforts with him and would ask [Mr. Border] yes and no questions, the answer to which only he would know. After confirming that [Mr. Border] had his wits about him, [Brother] would ask him if he still wanted to die and the answer was "yes." Even after [Mr. Border's] last hospitalization, which began on February 18, 2012, [Brother] continued to make these communication efforts to determine [Mr. Border's] desires to the extent that he could make an informed decision and communicate it given his condition. To the extent that [Mr. Border] has been able to advise the family, his decision has always been to die, and the family was prepared for that. Unfortunately, [Brother] was never able to communicate with [Appellant] to share this information and, although he has been close to his brother, he has not been officially in charge of his care. Perhaps the circumstance of his not being in charge of [Mr. Border's] care is due to the fact that he was never made part of the initial guardianship proceedings, an oversight that he now wanted corrected by way of this petition.

... When, after hearing testimony, the [orphans' court] decided that [Mr. Border] should be permitted to die, [Appellant] stood by her belief of what [Mr. Border] would have wanted, indicating she had a problem with the [orphans' court's] ruling. [Although Appellant only met Mr. Border after he had been declared incompetent, from her conversations with Mr. Border, Ap-

pellant believed that Mr. Border would want lifesaving treatment in every possible scenario, as set forth in the 2007 Directive.] Based upon [Appellant's] ethical dilemma and having expressed that it held no personal animosity toward [Appellant], the [orphans' court] removed [Appellant] as guardian in favor of [Brother], who would see to it, without such ethical dilemma, that the [orphans' court's order] to remove life[-]support would be followed.

Orphans' Court Opinion, 5/14/2012, at 1–7.

On March 12, 2012, the orphans' court issued an order removing Appellant as guardian of Mr. Border's person, and appointing Brother as the replacement guardian of the person. Within that order, the orphans' court expressly stated that:

> C. [Brother] shall specifically have the power and authority to withhold and/or decline any life[-]sustaining medical treatment to [Mr. Border], and shall be permitted and authorized to direct that [Mr. Border] receive only that medical care that is necessary to alleviate his pain and provide him comfort.
>
> D. It is hereby ordered that [Brother] is authorized to immediately remove [Mr. Border] from a ventilator and/or any other form of life[-]support and that no action be taken by medical staff at The Reading Hospital and Medical Center to resuscitate [Mr. Border].

Order, 3/12/2012, at ¶¶ C & D.

Immediately after the orphans' court issued its order, Brother authorized the removal of Mr. Border's life-support, and Mr. Border died later that day. That same day, March 12, 2012, Appellant filed a notice of appeal to the orphans' court's order removing her as guardian of Mr.

Border's person. At the same time, Appellant filed a motion for preliminary injunctive relief and stay, seeking to stay the orphans' court's order, pending appeal. On March 14, 2012, given Mr. Border's death, the orphans' court denied Appellant's motion for a preliminary injunction as moot. This timely appeal followed.[3]

Appellant presents two issues on appeal:

> Does Mr. Borders' [sic] expressed wish for life[-]sustaining treatment as evidenced in his advanced directive executed prior to his incapacitated state survive scrutiny during incapacity?
>
> Did the [h]onorable [orphans'] [c]ourt err in removing appointed plenary guardian to Mr. Border based on the factual situation that she did not agree with removing his life[-]sustaining treatment, based on the substituted judgment standard?

Appellant's Brief at 2.[4]

■■■ Before we address the merits of Appellant's issues, we first determine whether the issues are moot and incapable of appellate review. As our Court has previously stated:

> Generally, an actual claim or controversy must be present at all stages of the judicial process for the case to be actionable or reviewable. *Plowman v. Plowman*, 409 Pa.Super. 143, 597 A.2d 701, 705 (1991). If events occur to eliminate the claim or controversy at any stage in the process, the case becomes moot. *Id.* Even if a claim becomes moot, we may still reach its merits if the issues raised in the case are capable of repetition, yet likely to continually evade appellate review. *Id. See also In re Fiori*, 543 Pa. 592, 673 A.2d 905, 909 n. 4 (1996) [ ];

---

3. The requirements of Pennsylvania Rule of Appellate Procedure 1925 have been satisfied in this matter.

4. For ease of consideration, we have reordered Appellant's presentation of the issues on appeal.

*Commonwealth v. Bernhardt,* 359 Pa.Super. 413, 519 A.2d 417, 420 (1986) (holding exception to mootness doctrine exists where "(1) the question involved is capable of repetition but likely to evade review, or (2) the question involved is one of public importance"). Therefore, if the issues raised by an appeal are "substantial questions" or "questions of public importance," and are capable of repetition, yet likely to evade appellate review, then we will reach the merits of the appeal despite its technical mootness. *Id.*

*In re Duran,* 769 A.2d 497, 502 (Pa.Super.2001) (parallel citations omitted).

Here, Mr. Border's death soon after the orphans' court issued the March 12, 2012 order renders the issues raised in this appeal technically moot. Appellant's issues on appeal, however, are of great public importance, are capable of repetition, and are likely to evade appellate review. *See e.g. In re Fiori,* 673 A.2d at 909 n. 4 (holding death of patient did not preclude appellate review where issue was of important public interest, capable of repetition, yet apt to elude appellate review). Accordingly, we proceed with the merits of this appeal.

■ Appellant's first issue on appeal addresses the continued, post-incapacity, validity of the 2007 Directive executed by Mr. Border. Resolution of this issue requires us to construe and interpret a variety of statutes. "Issues involving statutory interpretation present questions of law for which our standard of review is *de novo* and our scope of review is plenary."

*In re Jacobs,* 936 A.2d 1156, 1163 (Pa.Super.2007).

Within its Rule 1925 opinion, the orphans' court explained that, as part of its April 14, 2010 order declaring Mr. Border incapacitated and appointing Mr. Border's daughter as guardian of his person and Appellant as guardian of his estate, the orphans' court revoked all existing powers of attorney, including those for health care. Orphans' Court Opinion, 5/14/2012, at 2.[5] The orphans' court interpreted the effect of that language as revoking the entire 2007 Directive. Consequently, throughout these proceedings, both the orphans' court and the Hospital treated the 2007 Directive as persuasive evidence of Mr. Border's desires, but not as a binding legal document. Orphans' Court Opinion, 5/14/2012, at 3.

Appellant, however, argues that the Directive should have survived Mr. Border's declaration of incapacity. Appellant's argument is based upon the longstanding right to self-determination in regard to the acceptance or rejection of life-sustaining medical treatment. *See* Appellant's Brief at 12–14. Applying the right to self-determination to this matter, Appellant argues that Mr. Border's 2007 Directive survived his declaration of incapacity. *Id.* In support of her argument, Appellant relies upon our Supreme Court's language in *In re Fiori,* and applicable statutes.

Specifically, in *In re Fiori,* the Supreme Court determined the procedures and guidelines for removal of life-sustaining treatment from a person in a persistent vegetative state, where that person, prior

---

**5.** Specifically, the April 14, 2010 order set forth as follows: "It is hereby further ORDERED AND DECREED any other existing general power of attorney, limited power of attorney and/or health care power of attorney executed by [Mr. Border] is hereby revoked and rendered null and void." Orphans' Court Order, 4/14/2010. Additionally, we note that the orphans' court's amended order, removing Ms. Vongpathoum as guardian of his person and appointing Appellant to serve as guardian of both Mr. Border's person and estate contained the same language. *See* Order, 4/28/2010.

to his incompetency, failed to express his desires on such treatment. *Id.* at 600, 673 A.2d 905. Relevant to this opinion, in *In re Fiori*, the Supreme Court explained:

> [t]he right to refuse medical treatment has deep roots in our common law. More than a century ago, the United States Supreme Court recognized that "[n]o right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person...." *Union Pacific Railway Co. v. Botsford*, 141 U.S. 250, 251, 11 S.Ct. 1000, 35 L.Ed. 734 (1891).
>
> From this right to be free from bodily invasion developed the doctrine of informed consent. *See Schloendorff v. Society of New York Hospital*, 211 N.Y. 125, 105 N.E. 92, 93 (1914) (Cardozo, J.). The doctrine of informed consent declares that absent an emergency situation, medical treatment may not be imposed without the patient's informed consent. *Moure v. Raeuchle*, 529 Pa. 394, 604 A.2d 1003, 1008 (1992). A logical corollary to this doctrine is the patient's right, in general, "to refuse treatment and to withdraw consent to treatment once begun." *Mack [v. Mack*, 329 Md. 188] 618 A.2d [744], 755 [ (1992) ]. Courts have unanimously concluded that this right to self-determination does not cease upon the incapacitation of the individual. *See, e.g., In re Colyer*, 99 Wash.2d 114, 660 P.2d 738 (1983); *Mack, supra; In re Quinlan*, 70 N.J. 10, 355 A.2d 647 (1976).

*In re Fiori*, 673 A.2d at 909–910 (parallel citations omitted). In *In re Fiori*, the Supreme Court went on to acknowledge that the right to self-determination is not absolute, and must be balanced the against interest of the state. *Id.* at 910. Significant to this case, however, is the acknowledgement by our Supreme Court that the right to self-determination does not cease upon one's incapacitation. *Id.*

The essence of the Supreme Court's holding in *In re Fiori*, that a person's right to self-determination does not cease upon incapacity, is echoed in the Health Care Agents and Representatives Act, 20 Pa. C.S.A. § 5421 *et seq.* (the "Act"), which is Chapter 54 of the larger Probate, Estates and Fiduciaries Code (the "Code"). Passed in 2006, the General Assembly intended the Act to provide "a statutory means for competent adults to control their health care through instructions written in advance or by health care agents or health care representatives and requested orders." 20 Pa.C.S.A. § 5423(a). Significantly, the Act expressly states that nothing within it is intended to affect or supersede the holdings of *In re Fiori*. *See* 20 Pa.C.S.A. § 5423(a)(1).

Application of the Supreme Court's decision in *In re Fiori* and the relevant provisions of the Act are significant to this matter and require our analysis. First, however, we begin by clarifying a number of relevant and often confusing concepts and terms set forth in the Act and considered in relevant precedent. Specifically, we note that there is a difference between a "health care power of attorney" and a "living will."[6] Indeed, pursuant to Section 5422 of the Act, a "health care power of attorney" is "[a] writing made by a principal designating an individual to make health care decisions for the principal." 20 Pa.C.S.A. § 5422.

The same section of the Act defines the "principal" as:

---

**6.** This explanation is significant because, as we will explain *infra*, the orphans' court in this matter inadvertently blended the two concepts, therefore leading to additional confusion in this case.

[a]n individual who executes an advance health care directive, designates an individual to act or disqualifies an individual from acting as a health care representative or an individual for whom a health care representative acts in accordance with this chapter.

*Id.* Therefore, in this matter, Mr. Border is the principal.

■ A "living will," however, is "[a] writing made in accordance with [the Act] that expresses a principal's wishes and instructions for health care and health care directions when the principal is determined to be incompetent and has an end-stage medical condition or is permanently unconscious." *Id.* In other words, a health care power of attorney appoints an individual to make health care decisions on a principal's behalf, while a living will suggests what the principal wants those decisions to be. *Id.*

Also significant to our analysis are the definitions and differences between a health care agent and a guardian of one's person. Specifically, the Act defines a "health care agent," as "[a]n individual designated by a principal in an advance health care directive." *Id.* A health care agent has the authority to make all decisions regarding health care treatment that the principal could have made prior to incapacity. *See* 20 Pa.C.S.A. § 5456(a). Indeed, pursuant to Subsection 5456(c)(4) of the Act:

> After consultation with health care providers and consideration of the information obtained in accordance with paragraphs (1), (2) and (3), the health care agent shall make health care decisions in accordance with the health care agent's understanding and interpretation of the instructions given by the principal at a

time when the principal had the capacity to understand, make and communicate health care decisions. Instructions include an advance health care directive made by the principal and any clear written or verbal directions that cover the situation presented.

20 Pa.C.S.A. § 5456(c)(4).

■ A guardian of the person, in contrast, is responsible for more than just health care decisions on behalf of the principal. A guardian of the person is responsible for all of an incapacitated person's care and custody. *See* 20 Pa.C.S.A. § 5521 (setting forth the powers, duties and liabilities of guardians); *Rock v. Pyle,* 720 A.2d 137, 141 (Pa.Super.1998) (defining the concept of a "guardian" under Pennsylvania law and distinguishing between the duties of a guardian of the person and a guardian of the estate).[7]

With these statutory directives in mind, we consider the legal viability of the 2007 Directive at the time of the Department's 2012 petition to remove Appellant as guardian of Mr. Border's person. Within its 2010 orders declaring Mr. Border incapacitated and appointing guardians on his behalf, the orphans' court included language wherein it purported to revoke "any other existing general power of attorney, limited power of attorney and/or health care power of attorney" previously executed by Mr. Border. *See* Orphans' Court Order, 4/14/2010 & Orphans' Court Order, 4/28/2010. Throughout these proceedings, the orphans' court functioned under the mistaken belief that the cited language revoked the entire Directive, including both the health care power of attorney and the separately set forth living will. Orphans' Court Opinion, 5/14/2012, at 3.

---

**7.** For example, as guardian of his person, Appellant purchased clothing for Mr. Border and oversaw his care and social well-being while a resident at the nursing facility.

The cited language in the orphans' court orders, however, addresses **only powers of attorney,** it does not address living wills. *See* Orphans' Court Order, 4/14/2010 & Orphans' Court Order, 4/28/2010. Therefore, contrary to the orphans' court's assumption, by its own terms the orphans' court's orders only attempted to revoke the health care power of attorney contained within the 2007 Directive, not the entire Directive, including the living will portion.

Moreover, under the Act, the orphans' court had no authority to revoke the 2007 health care power of attorney. Specifically, under Section 5454 of the Act, "[u]nless the health care power of attorney states a time of termination, it is valid until revoked by the principal or the principal's guardian of the person, notwithstanding the lapse of time since its execution." 20 Pa.C.S.A. § 5454(d). Therefore, pursuant to the clear terms of Section 5454, unless the health care power of attorney states a time of termination (which Mr. Border's did not), it is valid until revoked by the principal (Mr. Border), or the principal's guardian of the person (Appellant). *Id.* Nothing within Section 5454(d) gave the orphans' court authority to revoke Mr. Border's health care power of attorney which named his daughter as his health care agent. Furthermore, we note that under the terms of Section 5454, because a guardian has the authority to revoke a power of attorney, the statute recognizes that the power of attorney remains valid beyond a principal's declaration of incapacity and the appointment of a guardian.

Therefore, contrary to the orphans' court's presumption, we hold that Mr. Bor-

der's 2007 Directive, including both his living will and his health care power of attorney, remained a binding legal document, even beyond his declaration of incapacity and the orphans' court's April 2010 orders purporting to revoke the power of attorney portion of the Directive. At the time of the March 12, 2012 hearing on the emergency petition filed by the Hospital, Mr. Border's Directive should not have been treated merely as persuasive evidence of his desires, but as a binding legal document. Consequently, to the extent that Appellant's first issue on appeal argues that Mr. Border's 2007 Directive survived his incapacity, we agree.

■ Resolution of Appellant's second issue on appeal requires us to sort out whether the orphans' court's determination, ultimately authorizing the termination of Mr. Border's life-support, was erroneous. Pursuant to the Supreme Court's guidance in *In re Fiori,* when an individual is in a persistent vegetative state there are two potential frameworks for implementation of the patient's wishes regarding the perpetuation of life-support. If, prior to incapacitation, the patient created advance written directives, *In re Fiori* instructs that the Act provides the steps to follow for implementation of the instructions in those directives. *In re Fiori,* 673 A.2d at 910–911 *citing* the Advance Directives in Health Care Act, 20 Pa.C.S.A. § 5401 *et seq., repealed by* P.L. 1484, No. 169 § 3, effective January 29, 2007.[8] By contrast, the Supreme Court's holding in *In re Fiori* instructs that, where a once competent person in a persistent vegetative state left **no** advance directive, the decision whether to remove life-sustaining treatment may be

---

**8.** Since the Supreme Court's decision in *In re Fiori,* the General Assembly repealed the act referred to in that matter and replaced it with the Act that we now discuss. As set forth above, within the new Act, the General As-

sembly expressly stated that it intended the holdings of *In re Fiori* to remain effective. *See* 20 Pa.C.S.A. § 5423(a)(1). Consequently, where *In re Fiori* refers to the old act, we apply the new Act.

made without court involvement through application of the "substituted judgment standard." *In re Fiori*, 673 A.2d at 912.[9]

In this matter, because the 2007 Directive remained legally binding at the time of his 2012 hospitalization, the parties and the orphans' court in this matter **should have** applied the Directive and the relevant provisions of the Act to guide them in their decision making process. Were this case not moot, we would remand the matter to the orphans' court for proper application of the Directive. Unfortunately, considering Mr. Border's death, to remand at this point would be futile. Considering the importance of the issue, however, we are constrained to make a few observations regarding proper application of the Directive in this matter.

Specifically, Mr. Border's 2007 Directive appointed his eldest daughter, Ms. Vong-pathoum, as his health care agent. Based upon our holding that the 2007 Directive survived Mr. Border's incapacity, it follows that the appointment of Ms. Vongpathoum as Mr. Border's health care agent remained in effect in 2012 when the issue arose regarding whether to sustain Mr. Border's life-support.[10]

Therefore, in February/March of 2012, pursuant to the Directive, as implemented under the terms of the Act, Ms. Vongpathoum had the authority to make decisions on Mr. Border's behalf, consistent with her understanding and interpretation of Mr. Border's living will. *See* 20 Pa.C.S.A. § 5456(c)(4). Based upon representations within the certified record, Ms. Vongpathoum interpreted the living will to authorize termination of Mr. Border's life-support.

Ms. Vongpathoum's authority as Mr. Border's health care agent, however, was

**9.** Pursuant to the new Act, however, where a once competent individual, who does not have a health care power of attorney is deemed by an attending physician to be incompetent, a health care **representative,** (not to be confused with a health care **agent**), may exercise authority to make health care decisions on the once competent individual's behalf. *See* 20 Pa.C.S.A. § 5461. The Act lists the individuals who may act as a health care representative, in descending order of priority. *See* 20 Pa.C.S.A. § 5461(d)(1). For example, first an individual's spouse, unless an action for divorce is pending . . . , followed by an adult child, then a parent, then an adult brother or sister, and so on. *Id.*

Because the Act provides for the appointment of a health care representative where a once competent individual left no health care directive, and because the Act expressly states the General Assembly's intent to maintain the holdings of *In re Fiori*, we infer that in making health care decisions, the new Act charges the health care representative with carrying out the substituted judgment standard. Pursuant to *In re Fiori*, application of the substituted judgment standard:

considers the patient's personal value system for guidance. The surrogate considers the patient's prior statements about and

reactions to medical issues, all the facets of the patient's personality that the surrogate is familiar with—with, of course, particular reference to his or her relevant philosophical, theological, and ethical values—in order to extrapolate what course of medical treatment the patient would choose.

The substituted judgment approach is intended to ensure that the surrogate decision maker effectuates as much as possible the decision that the incompetent patient would make if he or she were competent. Even where the individual has not expressed thoughts concerning life-sustaining treatment, the patient's preferences can still be ascertained by referring to all of the aspects of his or her personality.

*In re Fiori*, 673 A.2d at 911, quoting *In re Jobes*, 108 N.J. 394, 529 A.2d 434, 444 (1987) and *Estate of Longeway*, 133 Ill.2d 33, 139 Ill.Dec. 780, 549 N.E.2d, 292, 299–300 (1989) (citations and quotations omitted).

**10.** We note that Ms. Vongpathoum's status as Mr. Border's health care agent survived his incapacity, notwithstanding the trial court order removing her as guardian of Mr. Border's person. Again—there is a difference between a health care agent and a guardian of one's person. *Supra.*

not absolute. Rather, pursuant to Section 5460 of the Act, entitled "Relation of health care agent to court-appointed guardian and other agents," an agent remains accountable to a principal and, if appointed, **the principal's guardian of the person.** *See* 20 Pa.C.S.A. § 5460(a). Furthermore, under this section of the Act, the guardian has the power to revoke or amend the appointment of the health care agent. *Id.* The Supreme Court has interpreted this provision as "providing an additional layer of protection to incompetent persons, as a health care agent may be deprived of the power to make life-ending decisions by a guardian." *In re D.L.H.*, 606 Pa. 550, 2 A.3d 505, 515 (2010).

In this matter, Appellant, as guardian of Mr. Border's person, made it very clear that she disagreed with those individuals, including Ms. Vongpathoum, who were willing to authorize the termination of Mr. Border's life-sustaining treatment. Consequently, pursuant to Section 5460(a), had Ms. Vongpathoum been presented with the option of terminating Mr. Border's life-support, it was within Appellant's authority to overrule that decision and to revoke Ms. Vongpathoum's appointment as health care agent.[11]

Application of Mr. Border's wishes as expressed in his Directive, however, did not occur in this matter because the parties involved, including the orphans' court, mistakenly believed that the Directive was not enforceable. Therefore, rather than applying the Directive, the parties resolved the issue of Mr. Border's life-support based upon guardianship proceedings.

Therefore, to determine whether the orphans' court's decision to authorize the termination of Mr. Border's life-support was ultimately correct, we consider the guardianship proceedings undertaken by the orphans' court in this matter.

In the case of a petition for removal of a guardian, our Court's role is to determine whether the orphans' court abused its discretion. The power of the orphans' court to remove a guardian is an inherent right, which will not be disturbed unless there is a gross abuse of discretion. *See Cronauer v. Gring,* 184 Pa.Super. 213, 132 A.2d 772, 773 (1957).

Chapter 55 of the Code addresses treatment of incapacitated persons, including the appointment and removal of guardians. Specifically, Section 5515 of the Code addresses court removal of a guardian. *See* 20 Pa.C.S.A. § 5515. When referring to removal, however, that section simply incorporates two other sections of the Code related to decedent's estates. *See id.* (incorporating Section 3182, relating to grounds for removal, and Section 3183, relating to procedure for removal).

Within the provisions set forth at Section 3182, "[t]he court shall have exclusive power to remove a personal representative when ... for any other reason, the interests of the estate are likely to be jeopardized by his continuance in office." 20 Pa.C.S.A. § 3182(5). Our Supreme Court has interpreted subsection (5) as protecting the best interests of the estate. *See e.g. Scientific Living, Inc. v. Hohensee,* 440 Pa. 280, 270 A.2d 216, 224 (1970); *In*

---

11. We note the irony that, earlier in this decision we spent a great deal of time explaining that the orphans' court did not have the authority to revoke Ms. Vongpathoum's designation as health care agent, but pursuant to Section 5460(a) of the Act, we are constrained to observe that Appellant had the very authority that we deny the orphans' court. Because

of the procedural mishaps in this case, however, Appellant was never specifically asked whether she wished to terminate Ms. Vongpathoum as Mr. Border's health care agent and Appellant never exercised her authority and expressly removed Ms. Vongpathoum as said agent.

re Estate of DiMarco, 435 Pa. 428, 257 A.2d 849, 854 (1969) (applying a best interest standard but reversing the orphans' court's removal of coexecutor of the subject estate).

Furthermore, pursuant to Section 3183, entitled "procedure and effect for removal," "[t]he court on its own motion may, and on the petition of any party in interest alleging adequate grounds for removal shall, order the personal representative to appear and show cause why he should not be removed, or, when necessary to protect the rights of creditors or parties in interest, may summarily remove him." 20 Pa. C.S.A. § 3183.

In this matter, the Hospital petitioned for removal of Appellant as guardian of Mr. Border's person, alleging that Appellant was not acting in Mr. Border's best interest.[12] At the hearing for Appellant's removal, the Hospital presented detailed medical testimony verifying that Mr. Border's situation was terminal, futile, and likely very painful. Indeed, Hospital personnel believed that sustaining Mr. Border's treatment was contrary to his medical diagnosis and prognosis. Additionally, the Hospital presented substantial testimony from Brother, who had known Mr. Border his entire life. Brother explained his relationship with Mr. Border, their discussions about his prognosis and desires, and his understanding that Mr. Border would not have wanted to maintain treatment. Furthermore, Brother explained that he testified with the support of the rest of Mr. Border's adult family, and their collective belief that Mr. Border would not have wanted life-sustaining treatment in his condition.

Appellant, on the other hand, steadfastly maintained her determination not to consent to the cessation of Mr. Border's treatment, primarily relying upon Mr. Border's living will. Within that living will, Mr. Border set forth the following elections:

| | |
|---|---|
| If I am unconscious, in a coma, or in a persistent vegetative state and there is little or no chance of recovery | Yes, I would want to have life-sustaining treatments. |
| If I have permanent severe brain damage (for example severe dementia) that makes me unable to recognize my family or friends | Yes, I would want to have life-sustaining treatments. |
| If I have a permanent condition that makes me completely dependent on others for my daily needs (for example, eating, bathing, toileting) | Yes, I would want to have life-sustaining treatments. |
| If I am confined to bed and need a breathing machine for the rest of my life | Yes, I would want to have life-sustaining treatments. |
| If I have pain or other severe symptoms that cannot be relieved | Yes, I would want to have life-sustaining treatments. |

12. We note that neither party addresses whether the Hospital had adequate standing to maintain its petition. Therefore, we have not given consideration to the Hospital's standing in this matter, as any argument opposing the Hospital's standing in this case was waived for failure to preserve it with the orphans' court. See In re: Condemnation by Urban Redev. Auth. of Pittsburgh, 590 Pa. 431, 913 A.2d 178, 181 n. 6 (2006) ("[T]he courts of this Commonwealth view the issue of standing as nonjurisdictional and waivable.")

| | |
|---|---|
| If I have a condition that will cause me to die very soon, even with life-sustaining treatments | Yes, I would want to have life-sustaining treatments. |

Directive, 7/25/2007, at Part III(A).[13]

Reliant upon the elections set forth above, Appellant argues that Mr. Border's living will directs that life-sustaining treatments be administered, even in the most dire of circumstances. Additionally, Appellant cites to conversations that she had with Mr. Border, after he was legally incapacitated but was still capable of speech, wherein Mr. Border declared his desire to live. Appellant argues that based upon the evidence before the orphans' court at the March 12, 2012 hearing, the orphans' court erred when it removed her as guardian of Mr. Border's person so that it could appoint a different guardian who was willing to, and indeed, did, authorize the termination of life-sustaining treatments.

The orphans' court considered the evidence set forth above and determined that Appellant's refusal to authorize the termination of Mr. Border's life-sustaining treatment was not within his best interest. We find no abuse of discretion in that determination. Indeed, pursuant to provisions of the Act set forth above, we find Mr. Border's living will, which remained a binding contract notwithstanding the orphans' court's and the parties' mistaken belief that the Directive was not enforceable, as the best evidence of what he would have wanted in such a situation. While the sections of the living will relied upon by Appellant elected life-sustaining treatment, the living will also expressly states that Mr. Border intended his elections to serve only as a "general guide" and could be altered if alteration was in his best

interest. *See* Directive, 7/25/2007, at Part III(C). Specifically, under the section entitled "How Strictly You Want Your Preferences Followed," Mr. Border stated:

> I want my preferences, expressed above in this Living Will, to serve as a general guide. I understand that in some situations the person making decisions for me may decide something different from the preferences I express above, if they think it is in my best interest.

*Id.* Significantly, Mr. Border did not select the election directing that his preferences be "strictly" followed, even if not in his best interest. *Id.*

Considering the above provisions, along with the testimony of Brother and Hospital personnel, the orphans' court was well within its discretion to remove Appellant as guardian of Mr. Border's person. Mr. Border's election of the "general guide" criteria within his living will reflected what Mr. Border's wishes were and gave guidance as to what would be in his best interest. Testimony from Hospital personnel and Brother established that cessation of Mr. Border's life-support was indeed within his best interest. Appellant, however, ignored Mr. Border's election of the "general guide" criteria and steadfastly relied upon elections that Mr. Border made years before his medical decline. By ignoring Mr. Border's selection to have his elections serve merely as a "general guide," Appellant acted contrary to the terms Mr. Border's living will. Therefore, we agree with the orphans' court that, in February/March of 2012, when Appellant

---

**13.** Pursuant to the living will, "[s]ome examples of life-sustaining treatments are CPR (cardiopulmonary resuscitation), breathing machine (Mechanical ventilation), kidney dialysis, feeding tubes (*artificial nutrition and hydration*), and medicines to fight infection (*antibiotics*)." *Id.*

refused to authorize the termination of Mr. Border's life-sustaining treatment, Appellant ceased acting within Mr. Border's best interests.

Consequently, we find no error in the orphans' court's removal of Appellant as Mr. Border's guardian, and the court's designation of Brother as guardian of Mr. Border's person, which order authorized Brother to permit the termination of Mr. Border's life-sustaining treatment.

Order affirmed.