J. A18009/15

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE:  ERIKA BAILEY, | : | IN THE SUPERIOR COURT OF |
| A/K/A ERICKA BAILEY, AN ALLEGED | : | PENNSYLVANIA |
| INCAPACITATED PERSON | : | |
| | : | |
| APPEAL OF:  JAMES BAILEY, SR., | : | No. 2 MDA 2015 |
| | : | |
| Appellant | : | |

Appeal from the Decree, October 21, 2014,
in the Court of Common Pleas of Huntingdon County
Orphans' Court Division at No. 2014-184

BEFORE:  FORD ELLIOTT, P.J.E., STABILE AND MUSMANNO, JJ.

MEMORANDUM BY FORD ELLIOTT, P.J.E.:        **FILED AUGUST 31, 2015**

Appellant, James Bailey, Sr. ("Husband"), appeals the final decree declaring Erika Bailey ("Wife") incapacitated and appointing two of his adult children as co-guardians for Wife's person and estate.  We affirm.

Husband and Wife, age 71, resided together in their home in Mill Creek, Huntingdon County, until September of 2014.  In response to reports of need received by appellee, Huntingdon/Bedford/Fulton Area Agency on Aging ("the Agency"), an emergency petition for incapacity and the appointment of guardians was filed on September 9, 2014.  The Orphans' Court Division of the Court of Common Pleas of Huntingdon County issued an order on September 9, 2014, appointing the Agency as the emergency guardian of the person and estate of Wife, and appointed a guardian **ad litem** as well as counsel.  On September 10, 2014, another

order was entered extending the appointment of the Agency until September 28, 2014.

A hearing was held on October 10, 2014. On October 21, 2014, the Orphans' Court issued Findings of Fact and a Final Decree declaring Wife to be totally incapacitated and appointing two of Wife's children, Nicole Hicks and John Bailey, as plenary permanent co-guardians of her person and estate. Husband filed exceptions to the Final Decree on November 10, 2014. The exceptions to the Final Decree were denied on December 8, 2014.

On December 23, 2014, Husband filed a notice of appeal. On December 29, 2014, the Orphans' Court ordered Husband to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b); Husband timely complied and raises the following two issues for our review:

> Whether the Trial Court's Findings of Fact are supported by the record?
>
> Whether the Trial Court erred and/or abused its discretion by concluding that [Husband] was incapable of serving as [Wife]'s Guardian?

Husband's brief at 6.

Our standard of review is as follows:

> [T]he Court is bound by the trial judge's findings of fact unless those findings are not based on competent evidence. Conclusions of law, however, are not binding on an appellate court whose duty it is to determine whether there was a proper application of law to fact by the lower court.

*In re Peery*, 727 A.2d 539, 540 (Pa. 1999).

An incapacitated person is:

> [A]n adult whose ability to receive and evaluate information effectively and communicate decisions in any way is impaired to such a significant extent that he is partially or totally unable to manage his financial resources or to meet essential requirements for his physical health and safety.

20 Pa.C.S.A. § 5501. "The court, upon petition and hearing and upon the presentation of clear and convincing evidence, may find a person domiciled in the Commonwealth to be incapacitated and appoint a guardian or guardians of his person or estate." 20 Pa.C.S.A. § 5511(a).

In making a determination of incapacity, the Orphans' Court is required to make findings of fact:

> In all cases, the court shall consider and make specific findings of fact concerning:
>
> (1) The nature of any condition or disability which impairs the individual's capacity to make and communicate decisions.
>
> (2) The extent of the individual's capacity to make and communicate decisions.
>
> (3) The need for guardianship services, if any, in light of such factors as the availability of family, friends and other supports to assist the individual in making decisions and in light of the existence, if any, of advance directives such as durable powers of attorney or trusts.
>
> (4) The type of guardian, limited or plenary, of the person or estate needed based on the nature of any condition or disability

and the capacity to make and communicate decisions.

(5) The duration of the guardianship.

(6) The court shall prefer limited guardianship.

20 Pa.C.S.A. § 5512.1(a).

Additionally:

Once an individual has been found incapacitated within the meaning of 20 Pa.C.S. § 5501, Meaning of incapacitated person, and in need of guardianship services, it then becomes the court's responsibility to appoint an individual to serve, granting limited or plenary powers consistent with the incapacitated person's needs. When making the decision who shall so serve, the court may consider, in addition to all the evidence before it, the preference of the party. *Id.*, § 5511. The selection of a guardian for a person adjudicated incapacitated lies within the discretion of the trial court whose decision will not be reversed absent an abuse of discretion.

*Estate of Haertsch*, 649 A.2d 719, 720 (Pa.Super. 1994).

Instantly, Husband argues that many of the Orphans' Court's findings of fact are not supported by the evidence that was introduced at the October 10, 2014 hearing. The 23 findings of fact are as follows:

1. Erika Bailey, a/k/a Ericka Bailey (hereinafter referred to as "Mrs. Bailey") has stage three (3) dementia. N.T. at 3.

2. Based upon the fact that she has stage three (3) dementia, Mrs. Bailey is unable to provide any of her own medical history, unable to keep her own checkbook, and unable to

make any decisions concerning her physical health and safety.  N.T. at 3.

3. Mrs. Bailey is dependent on others for her basic needs.  N.T. at 4.

4. The dementia that Mrs. Bailey suffers from is progressive.  There is no medicine or course of treatment that will correct or improve her condition.  N.T. at 4.

5. In 2011, Mrs. Bailey's dementia started to progress, and she began wandering from her home.  N.T. at 19.

6. On September 8th, 2014, the Area Agency on Aging received a report of need stating that Mrs. Bailey was in danger and her nutritional/hygiene needs were not being met, despite the presence of the twenty-four (24) hour aide service.  N.T. at 20.

7. The Area Agency on Aging and Dr. Mary Etta Hadley Donohue (Geriatrics doctor) determined Mrs. Bailey required a locked dementia unit due to the progression of her dementia and her behavioral issues.  N.T. at 21.

8. The closest facility that could manage Mrs. Bailey's care and condition is in Berlin, PA. This facility has a locked dementia unit, specifically dedicated to the care and treatment of dementia patients.  N.T. at 22.

9. Mrs. Bailey's dementia, coupled with her requirement of several psychotropic drugs to control her behavioral issues would be difficult to manage at home.  N.T. at 25-26.

10. Mrs. Bailey's husband (hereinafter referred to as "Mr. Bailey") requires a high level of care. N.T. at 24.

11.   Mr. Bailey's sugar levels go up and down and as a result, his cognitive status fluctuates. N.T. at 24.

12.   Mr. Bailey has required care at the Meadowview facility when visiting his wife. N.T. 24-25.

13.   Mr. Bailey lacks the ability to understand Mrs. Bailey's dementia and her disease would make it difficult for him to make appropriate care choices for her.  N.T. at 25.

14.   Nicole Hicks is the daughter of Mr. Bailey and Mrs. Bailey.  N.T. at 42.

15.   Nicole Hicks visits Mrs. Bailey at the Meadowview facility every week, sometimes twice a week.  N.T. at 44.

16.   Nicole Hicks has bought Mrs. Bailey almost all of the clothing she owns.  N.T. at 44.

17.   Nicole Hicks believes, based upon her weekly visits to Berlin, PA, that her mother, Mrs. Bailey, is receiving appropriate care at the nursing facility.  N.T. at 45.

18.   Nicole Hicks is willing to serve as co-guardian of Mrs. Bailey, along with her brother, John Bailey.  N.T. at 46.

19.   John Bailey is the son of Mr. Bailey and Mrs. Bailey.  N.T. at 48.

20.   John Bailey prefers that Mrs. Bailey be at a nursing facility rather than at home.  N.T. at 50.

21.   John Bailey is willing to serve as a co-guardian of Mrs. Bailey.  N.T. at 50.

22. All of the children of Mr. Bailey and Mrs. Bailey agree that Mr. Bailey should not be a guardian of Mrs. Bailey.

23. Mr. Bailey's health condition and behavior make it impossible for him to provide the level of care necessary for Mrs. Bailey in the home.

Findings of fact, 10/21/14 at 1-6.

Basically, the crux of Husband's argument is that the Orphans' Court's conclusion that Wife needed to be placed outside her home is not supported by competent evidence. According to Husband, the first four findings of fact are taken from the expert testimony of Dr. Mary Etta Hadley Donohue who testified that Wife suffers from an incurable dementia which places her completely dependent on others for her care. However, Husband claims the Orphans' Court neglected that portion of Dr. Donohue's testimony that Wife could be maintained in her home by the team of caregivers currently in place and she saw no reason why Husband would be incapable of serving as Wife's guardian. (Appellant's brief at 10.)

Husband takes issue with finding of fact no. 7 that, according to Dr. Donohue and the Agency, Wife needed to be placed in a locked dementia unit due to the progression of her dementia and behavioral issues. Husband suggests that Dr. Donohue made no such recommendation. (*Id.* at 10-11.)

Husband disputes findings 10 through 13 regarding Wife's medical condition. Husband argues that during her testimony Jackie Hummel, a supervisor with the Agency, was expressing the reports of others and had no

first-hand observations to report. Furthermore, Husband asserts that Ms. Hummel was not qualified to make an assessment of his health and his ability to care for his wife. (*Id.* at 11-12.)

We begin by addressing Husband's argument regarding the first four findings of fact and the testimony of Dr. Donohue. Husband is correct that Dr. Donohue testified that Wife's needs were being met while she was in her home. (Notes of testimony, 10/10/14 at 6.) The doctor also testified Wife requires 24-hour care, and needs a guardian of her person and estate to make decisions for her. Additionally, the doctor stated Husband has health limitations that limit his ability to care for Wife. (*Id.* at 7-9.)

While the doctor did state that Wife's needs were being met, there is evidence in the record that Dr. Donohue assisted in placing Wife in a nursing care facility. Ms. Hummel testified the Agency was working with Dr. Donohue after the Agency filed the emergency guardianship:

> [Attorney for Husband:] What steps did you take once you filed the emergency guardianship concerning [Wife's] care?
>
> [Ms. Hummel:] We worked with Dr. Donohue to determine what kind of -- if they felt she needed nursing facility care. Due to the progression of her dementia and her behavioral issues and when I say that issue is reluctan[ance] to care at times she could become aggressive. She could wander. They felt she needed a locked dementia unit. So I proceeded to start close and span out to different facilities to try to find a facility that could manage her care and Berlin, PA was the closest appropriate facility that was able to accept her.

> Q.   What makes that facility appropriate?
>
> A.   They have a locked dementia unit. So it's nursing facility level of care. They have a unit that is specifically for dementia patients. The staff on that unit has special training in how to handle Alzheimer's patients.

*Id.* at 21-22.

The above testimony seems to indicate that Dr. Donohue was working with the Agency to place Mrs. Bailey in a facility with skilled nursing care. Additionally, on cross-examination, Ms. Hummel was further questioned regarding Dr. Donohue's involvement in having Mrs. Bailey moved out of Husband's home.

> [Attorney for Wife:] You said that when the decision was made to move her there was a form that would have been filled out by Dr. Donohue.
>
> [Ms. Hummel:] Yes.
>
> Q.   And at that point she [the doctor] felt that it was necessary for her to be in a locked dementia unit?
>
> A.   No. She felt she needed nursing facility level of care. Due to the wandering the assessor felt that she needed a locked unit.

*Id.* at 27.

Based on the above, contrary to Dr. Donohue's statement that Mrs. Bailey's needs were being met at home, it is clear that there is support in the record that she needed nursing facility skilled care. Additionally, we observe that Juna Marie Rose, Wife's in-home caregiver for five years,

testified that her knowledge of personal in-home care came from practical experience; she was not a nurse and had no specialized training working with dementia patients. (*Id.* at 59, 63.)

As to Husband's claim that Wife did not need to be in a secured dementia unit, the record reflects Wife was assessed and it was determined that she needed to be placed in a secured unit. (*Id.* at 21.) In fact, Ms. Hummel testified that in 2011, Wife's dementia started to progress. At that time, the Agency was working with Husband to help him understand what Wife's care issues were and what her limitations were because she was needing more care and more supervision. (*Id.* at 19.) Ms. Hummel further stated, in 2011, "[Wife] had started to wander from the home, we had gotten reports from State Police and others where she had wandered from the home and had to be brought back." (*Id.*) Clearly, the record supports Wife's need to be placed in a locked dementia unit for her own safety to prevent her from wandering off.

Husband next takes issue with the Orphans' Court's findings of fact regarding his own medical condition, as well as Ms. Hummel's opinion of his medical condition. Our review of the record indicates Dr. Donohue testified she is Husband's primary care physician. (*Id.* at 7.) The doctor did not address specific medical conditions, but only stated Husband would "probably be overly fatigued if he provided all of the care [for his wife]." (*Id.*)

Cathy Procelli, who was employed by Helpmates, an agency that provided in-home services, such as, cooking, cleaning, and helping with baths, testified that the Veterans Administration ("VA") would come into the home to give Husband a bath, like she did for Wife. (*Id.* at 13, 15.) John Bailey, appellant's son, testified his father suffers from diabetes, macular degenerative disease, such that he has to have someone do any driving for him, and he has a disability with his back, such that he needs someone to help him bathe. (*Id.* at 52-53.) Ms. Rose, the in-home caregiver, testified that she has assisted Husband in putting bandages on his legs when needed, and she also helps him write checks because of his poor eyesight. (*Id.* at 65-66.)

Jerry Bailey, one of Husband and Wife's children, testified that for the last six months, he was at the family home between three and five days a week. (*Id.* at 29-30.) He testified that his father is not able to take care of his mother. (*Id.* at 32.) He stated, "It's the caregivers that tend her." (*Id.*)

Even without Ms. Hummel's testimony regarding her opinion of Husband's medical condition, there is sufficient testimony from other witnesses regarding the state of Husband's health. The record is replete with testimony that Husband requires outside help to take care of himself as well as his wife.

In his second issue, Husband argues he should have been appointed guardian of his Wife's person and estate. A guardian of the person is responsible for all of an incapacitated person's care and custody. ***In re Estate of Border***, 68 A.3d 946, 956 (Pa.Super. 2013), citing 20 Pa.C.S.A. § 5521. The selection of a guardian for an incapacitated person lies within the trial court's discretion. ***Estate of Haertsch***, 649 A.2d at 720-2721. The Probate, Estates and Fiduciary Code[1] gives the trial court broad discretion to appoint as guardian "any qualified individual"[2] or agency, 20 Pa.C.S. § 5511, but the court should select the guardian based on the best interests of the incapacitated person. ***In re Duran***, 769 A.2d 497, 506 (Pa.Super. 2001), citing ***In re Estate of Dorone***, 535 A.2d 452, 454 (Pa. 1987).

Husband contends it was Dr. Donohue's opinion that he was capable of serving as his wife's guardian, and as such, the trial court should have appointed him his wife's guardian. In explaining its decision, the Orphans' Court opined:

> Mr. Bailey was very clear in his testimony. Had we acquiesced to his wishes and appointed him as his wife's guardian, he would have removed his wife from the secure dementia unit where she is currently a patient. Mrs. Bailey's quality of life would be extremely diminished if forced to return to her

---

[1] 20 Pa.C.S.A. § 101 ***et seq.***

[2] The term "any qualified individual" is not defined by statute, and the relevant statutory provisions do not delineate a set of factors a court must consider in appointing a guardian.

home, especially when compared to the exceptional care she receives at the Meadow View personal care home in Berlin, Pennsylvania. While at Meadow View, Mrs. Bailey is maintained in a facility designed to treat and care for patients suffering from dementia. Quite frankly, the desire of Mr. Bailey to have his wife removed from the dementia unit is evidence of the lack of judgment that would prevail if we had appointed Mr. Bailey as his wife's guardian.

Our decision not to consider Mr. Bailey as a guardian of his wife was required when considering Mr. Bailey's own medical history, his vision issues and his general confusion in the courtroom. A return home for Mrs. Bailey would equate to a recipe for failure. While her treating physician did testify that Mrs. Bailey could be maintained in her home, that testimony was not developed to explain how nonprofessional care givers would be able to manage that task. Certainly, it is possible to maintain any patient in the home when battling a serious illness. The question, however, is whether there are the resources and care givers in place to do so. The very person charged with the daily care of Mrs. Bailey, prior to her removal from the home, testified that she took care of Mrs. Bailey "to the best of my ability . . . I'm not trained." (Testimony of Juna Marie Rose N.T. 59.) Although he is well intentioned, Mr. Bailey is not able [sic] of providing appropriate care and making proper decisions for his wife. We have chosen the option of superior, licensed and professional care as opposed to having Mrs. Bailey "maintained" in her home.

Orphans' Court opinion, 2/10/15 at 2-3.

The Orphans' Court appointed two of Husband and Wife's children, Nicole Hicks and John Bailey, as co-guardians of Wife's person and estate. Nicole Hicks, who is a registered nurse, testified she visits her mother every week and sometimes twice a week. (Notes of testimony, 10/15/14 at 43-

44.) She described the difference in her mother the first time she visited her at the nursing facility as, "She was kempt. She was dressed well, not in just, you know, diapers. [M]y mother was always cold and, she was in warm clothing and stuff like that. And we [my husband and I] were just totally surprised by the transformation." (*Id.*) When asked if she would be in favor of moving her mother back to her father's house, she replied, "No way." (*Id.* at 45-46.)

John Bailey testified that before his mother was placed in the nursing facility, he was worried about her. He testified:

> In the last few months[,] my dad has changed and the stress that has changed him has changed the way they live. My mother no longer sleeps in her bedroom. She sleeps in another room. Healthcare-wise we do -- the toenails. I've seen moldy food in the kitchen.
>
> But as far as mom's physical condition, it's declining and at a point that when I talked to the healthcare workers and I asked them specifically -- Juna and Peggy I had talked to before -- about, you know, there would be a point that will come to or a line that we've got to say[,] is this beyond us and I think we were at that point[,] not just for my mom's sake but for my dad's sake too. The stress and -- could the healthcare be better? I don't know whether it could be or not. Mom became so belligerent and angry at points where, you know, she wouldn't let anybody touch her, so I don't fault the healthcare for that. I fault the training of the healthcare. I think my mother is to a point where she needs trained professional people to deal with these situations. I seen [sic] her at the [nursing] home. She looks better. She looks healthy.

*Id.* at 48-49.

- 14 -

J. A18009/15

John Bailey was asked if he thought his father should be appointed guardian. He answered:

> I don't think my dad -- my dad's living with this and he doesn't see what it's doing and if you look from the outside [in], anybody in this courtroom that knows my dad to where my dad was a year ago or six months ago to where he is today, the stress and the care and everything[,] I don't think he's capable of. I think he's capable of supplying help but I don't think that help is the appropriate help but I don't think he's capable of being a guardian.

*Id.* at 50.

The Orphans' Court found Nicole Hicks and John Bailey would serve their Mother's best interests by keeping her in the nursing facility. This decision by the Orphans' Court, in light of all the evidence before it, was reasonable and supported by the record. We discern no error. Accordingly, we affirm the final decree of the Orphans' Court.

Decree affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 8/31/2015

- 15 -